OPINION
Pursuant to leave granted under App.R. (5) (A), defendant-appellant, Walter E. Myers, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of (1) three counts of rape in violation of R.C. 2907.02, each with a sexually violent predator specification under R.C. 2941.148, (2) two counts of aggravated burglary in violation of R.C. 2911.11, (3) one count of burglary in violation of R.C. 2911.12, and (4) one count of kidnapping in violation of R.C. 2905.01, with a sexual motivation specification under R.C. 2941.147.
By indictment filed June 27, 1997, defendant was charged with five counts of rape, each with a sexually violent predator specification, three counts of aggravated burglary, and one count of kidnapping with a sexual motivation specification. The trial court entered a nolle prosequi on the fifth count of rape; a jury found defendant guilty of three counts of rape, not guilty of one count of rape, guilty of two counts of aggravated burglary, guilty of the lesser-included offense of burglary on the third count of aggravated burglary, and guilty of kidnapping, including the sexual motivation specification. Following a separate evidentiary hearing, the jury found defendant guilty of all three sexually violent predator specifications accompanying the three counts of rape. The trial court sentenced defendant accordingly, and defendant appeals, assigning the following errors:
 ASSIGNMENT OF ERROR ONE: THE TRIAL COURT ERRED WHEN IT ALLOWED, OVER REPEATED OBJECTIONS, IMPERMISSIBLE HEARSAY STATEMENTS FOR THE SOLE PURPOSE OF BOLSTERING THE ALLEGED VICTIM'S TESTIMONY IN DIRECT VIOLATION OF EVID. R. 803(2); 803(4); THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION; AND ARTICLE I, SECTIONS 9 AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR TWO: THE DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL UNDER BOTH THE OHIO AND FEDERAL CONSTITUTIONS WHEN THE TRIAL COURT ADMITTED, OVER NUMEROUS OBJECTIONS, OTHER BAD ACTS AND CRIMES OF THE DEFENDANT CONTRA EVID. R 404 (A) (1) AND 404(B).
 ASSIGNMENT OF ERROR THREE: THE TRIAL COURT COMMITS PLAIN ERROR WHEN IT ALLOWS THE STATE TO QUESTION THE DEFENDANT REGARDING PREJUDICIAL, IRRELEVANT AND HIGHLY INFLAMMATORY COMMENTS HE MADE DURING A POLICE INTERROGATION CONTRA THE OHIO AND FEDERAL CONSTITUTIONS THEREBY DENYING THE DEFENDANT HIS RIGHT TO A FAIR TRIAL.
 ASSIGNMENT OF ERROR FOUR: THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR FIVE: SECTION 2971.01, 2971.02, AND 2971.03 OF THE OHIO REVISED CODE IMPOSE MULTIPLE PUNISHMENTS FOR THE SAME OFFENSE IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10
OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR SIX: SECTIONS 2971.01, 2971.02, AND 2971.03 OF THE OHIO REVISED CODE ARE UNCONSTITUTIONALLY VAGUE INSOFAR AS SAID SECTIONS FAIL TO PROVIDE SPECIFIC GUIDANCE TO A JURY CALLED UPON TO DETERMINE WHETHER OR NOT A DEFENDANT IS A SEXUALLY VIOLENT PREDATOR THEREBY RESULTING IN ARBITRARY AND ERRATIC CONVICTIONS OF THAT SPECIFICATION.
Defendant's convictions arose from defendant's alleged sexual assault of Eleanor Douglas on April 10, 1997. Douglas, a fifty-year-old woman who suffers from cerebral palsy, cannot eat, dress, bath, take medication, or move from her hospital bed to her wheelchair without the assistance of care providers, who maintain a routine schedule of assistance for her.
At all times pertinent to this case, Douglas resided at an apartment complex designed to accommodate elderly and handicapped residents. Each morning, a care provider arrived at Douglas' apartment at approximately 7:00 a.m. to prepare breakfast and to assist Douglas with her daily activities. The morning care provider departed at approximately 11:00 a.m., and an evening care provider arrived at 5:00 p.m. to prepare dinner and to place Douglas, through use of an electric lifting device, into her hospital bed. The evening care provider routinely departed Douglas' apartment at approximately 11:00 p.m., leaving the front door of the apartment unlocked because Douglas could not afford a duplicate key with which the morning care provider could access the apartment. Because Douglas was physically unable to get out of bed without assistance, she slept with an emergency call button within her reach to summon assistance in case of an emergency.
Prior to the alleged attack, defendant's grandparents and aunt, as well as Douglas, all lived in the same apartment building. Defendant frequently visited his relatives in the apartment building and maintained a friendly relationship with many of the residents, including Douglas. Douglas testified that defendant visited her in her apartment on two occasions prior to April 10, 1997 in the presence of one or more care providers.
The prosecution and defense presented substantially different accounts of the events that occurred on April 10, 1997. Cynthia Jones, Douglas' night care provider, testified that she left Douglas' apartment at 11:15 p.m. after putting Douglas in bed by means of the electric hoist, and placing the emergency call button within Douglas' reach. Douglas testified that after her care provider placed her in bed and left for the evening, she heard someone knocking at her apartment door. Douglas did not respond to the knocking, as she assumed her care provider had forgotten something and would return through the unlocked front door. Having taken pain medication, Douglas attempted to go to sleep. After an unspecified time period, Douglas opened her eyes to see defendant standing in the doorway to her bedroom; defendant told Douglas he had buried his grandmother earlier that day.
After a brief conversation in which Douglas repeatedly asked defendant to leave her apartment, defendant approached Douglas' bed, unzipped his pants, and asked Douglas to perform fellatio. She refused, and defendant attempted to force her to do so. When Douglas resisted, defendant pulled back the bed covers, positioned himself on top of her, and vaginally raped her. After the attack, she heard her front door open and close. She did not use her emergency call button because she was not thinking clearly due to the combined effects of the attack and her pain medication.
Douglas went back to sleep, but the sound of her apartment door again opening and closing awoke her. Defendant re-entered her bedroom and again asked her to perform fellatio. She attempted to perform fellatio upon defendant, hoping that he would leave if she did so. According to Douglas, defendant became angered because Douglas could not perform to his satisfaction due to her disability, and he vaginally raped her a second time. During the second attack, Douglas became sick, and told defendant that she intended to use her emergency call button. Defendant broke the chain that connected the button to Douglas' bed rail and threw the button across the room. Douglas asked defendant to find her emergency call button because she was sick. Defendant purported to use a flashlight Douglas kept in her bedroom to find the call button, but he informed her he could not find it. She heard defendant use her telephone and leave the apartment again.
Douglas further testified that at some time after defendant left her apartment the second time, he returned and vaginally raped her again. After the third attack, she heard defendant open her refrigerator in the kitchen and heard the sound of glass clinking. After a period of silence, she called out to defendant, but she received no response. She went to sleep, and awoke the next morning when her care provider arrived.
According to defendant, he and Douglas engaged in consensual sexual intercourse on one occasion during the month prior to the alleged attack. Defendant testified that on April 10, 1997, he and Heather Siders, his girlfriend, returned from his grandmother's funeral to his aunt's apartment in the building where Douglas resided. He and Siders left his aunt's apartment that night and went to Douglas' apartment, where they knocked on the door, eventually heard Douglas tell them to enter the apartment, entered, and found Douglas awake in bed. He and Douglas engaged in consensual sexual intercourse while Siders waited in the other room. After having sexual intercourse with Douglas, he left, but returned twice immediately to get a wine cooler and some money from Douglas' apartment.
Siders testified that she and defendant went to Douglas' apartment at approximately 11:15 p.m. on April 10, 1997, and knocked on the door. Unlike defendant, Siders testified that Douglas answered the door in her wheelchair and admitted her and defendant. Douglas told defendant to place the emergency call button on the dining room table because Douglas had an emergency pull cord in her bedroom. Defendant then accompanied Douglas into Douglas' bedroom, where they engaged in consensual sexual intercourse on Douglas' bed. Defendant left Douglas' apartment with Siders, but as Siders waited in the hall, defendant returned twice in order to get a wine cooler and money.
Defendant's first assignment of error contends the trial court erred in admitting, over objection, the testimony of morning care provider Alice Hollingsworth, investigating detective Irma Holmes, emergency room nurse Barbara Beck, and emergency room physician Brian Seifferth. All four witnesses related to the jury statements Douglas made to them on the morning of April 11, 1997, concerning the details of the attack. The testimony closely paralleled Douglas' version of the attack, particularly the testimony of Detective Holmes. Defendant asserts the wrongly admitted evidence prejudiced him because the testimony improperly bolstered Douglas' version of the attack, especially because defendant and Siders maintained the encounter involved consensual sexual intercourse.
The state concedes the challenged testimony constitutes hearsay under Evid.R. 801(C), as the testimony relates Douglas' out of court statements to each testifying witness and is offered for its truth in support of Douglas' version of the attack. The state, however, contends the trial court properly admitted the testimony of Nurse Beck and Dr. Seifferth because that testimony related statements Douglas made for the purposes of medical diagnosis or treatment under Evid.R. 803(4). Similarly, the state asserts the trial court properly admitted the testimony of Hollingsworth and Detective Holmes because that testimony related Douglas' excited utterances under Evid.R. 803(2).
A. Evid.R. 803(4).
1. Nurse Beck
The state contends the testimony of Nurse Beck and Dr. Seifferth was properly admitted under Evid.R. 803(4). Under that rule, a hearsay statement is admissible if it is "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Statements which are admissible under Evid.R. 803(4) are assumed to be reliable because (1) the effectiveness of treatment often depends on the accuracy of the information related to the physician, see State v. Boston (1989), 46 Ohio St.3d 108,121, modified on other grounds, State v. Dever (1992),64 Ohio St.3d 401, 407, and (2) such statements are "reasonably relied upon by a physician in treatment or diagnosis." Dever,supra, at 411. Given the dual rationales for the exception, a two-part test has been adopted to determine admissibility of hearsay statements under Evid.R. 803(4): "First, the question is whether the declarant's motive is consistent with that of a patient seeking treatment. Second, the question is whether it is reasonable for the physician to rely on the information in diagnosis or treatment." State v. Clary (1991), 73 Ohio App.3d 42,52 (adopting analysis from United States v. Iron Shell
(C.A.8, 1980), 633 F.2d 77).
Nurse Beck's testimony relates to information Douglas communicated to Nurse Beck during Nurse Beck's compilation of a medical history during the emergency room intake procedure. The trial court permitted Nurse Beck to testify, over objection, as follows:
 She said that her caretaker had just left her house, and as her usual routine she leaves about 11:00 at night, and she heard somebody knocking on her door. She said she thought it is her caretaker that had returned because maybe she is forgot [sic] something, but the knocking persisted and then soon after that, [defendant] arrived in her bedroom. She said that they talked and that shortly after that he asked if he could fondle her breasts and she said no. And then that he was laying on top of her, and he told — or she told him that he did not want to hurt her. He at that time rapes her vaginally and then left and returned and forced her to have oral sex with him and left again after throwing her emergency call light out of her reach. He returned again — I guess again, and forced her to have oral sex again. And this went on through the night. (Tr. 382-383.)
While the portions of the foregoing testimony reasonably relate to information given in seeking treatment, Nurse Beck's hearsay statements about the usual routine of Douglas' care provider, the knocking on her door, defendant's identity, the dialogue between her and defendant, and defendant's leaving the apartment and returning, do not bear on any cognizable diagnosis or treatment. Accordingly, the trial court erred in admitting those portions of Nurse Beck's testimony under Evid.R. 803(4).Clary, supra, at 53.
2. Dr. Seifferth
Regarding Dr. Seifferth's testimony, the trial court allowed Dr. Seifferth to testify that during Douglas' physical examination, Douglas alleged three separate incidents of vaginal penetration and two instances of oral penetration. Dr. Seifferth further testified that such allegations are important in the direction of the examination and diagnosis of any patient, and are "a standard part of the medical history" of the patient. (Tr. 450.) The statements thus fall within Evid.R. 803(4), as they were pertinent to an accurate diagnosis. See State v. Hairston (1990),67 Ohio App.3d 341, 348; Staff Note to Evid.R. 803(4).
Defendant nonetheless contends that Douglas' statements to Dr. Seifferth do not qualify as statements made for purposes of medical diagnosis or treatment because Dr. Seifferth indicated that when a sexual assault patient does not complain of any pain, a pelvic examination is conducted largely for forensic purposes. Here, Douglas not only complained of back pain from the attack, but Dr. Seifferth also testified that he conducted a "head-to-toe" examination of Douglas in order to discover any areas of trauma. Notably, Evid.R. 803(4) does not distinguish between medical examinations made for the purposes of treatment, and those made for the purposes of trial in cases where both objectives are involved. Staff Note to Evid.R. 803(4). The trial court did not abuse it discretion in admitting Douglas' statements to Dr. Seifferth, as those statements contemplated diagnosis, whether or not the examination was also forensic.
B. Evid.R. 803(2)
1. Care Provider Hollingsworth
Defendant also asserts the trial court misapplied the hearsay exception for excited utterances when it allowed Hollingsworth and Detective Holmes to testify to Douglas' statements to them. Evid.R. 803(2) excepts from exclusion under the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "The fact that this otherwise hearsay testimony is admissible is based on the notion that the excited statement maintains a high degree of reliability." State v. Taylor (1993), 66 Ohio St.3d 295, 300. The excited utterance exception "derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock that his reflective processes have beenstilled. Therefore, statements made under these circumstances are not likely to be fabricated." Id. (emphasis sic.) quoting Staff Note to Evid.R. 803(2) and McCormick on Evidence, 297 (2d ed. 1972).
In Taylor, the Ohio Supreme Court set forth a four-part test to determine the admissibility of an excited utterance, derived from the common law test for the admissibility of a "spontaneous exclamation." In order to admit otherwise hearsay as an excited utterance, a court must reasonably find:
 (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration. Id. at 300-301 (emphasis sic) quoting Potter v. Baker (1955), 162 Ohio St. 488, paragraph two of the syllabus.
Here, defendant essentially contends that the second prong is not satisfied in Douglas' hearsay statements to Hollingsworth and Detective Holmes. Specifically, defendant asserts that the challenged statements consisted of reflective narrative rather than unreflective expression, demonstrating that the nervous excitement from the attack no longer dominated Douglas' reflective faculties when she made the challenged statements.
Defendant challenges three separate hearsay statements Hollingsworth, the care provider, related to the jury: (1) shortly after she arrived at Douglas' apartment, Douglas spontaneously told her she had been attacked three times, (2) when she asked Douglas how she was attacked, or if she had been raped, Douglas responded that defendant had raped her, and (3) after she left the apartment to summon emergency personnel and returned, she asked Douglas why the emergency call button was on the dining room table, to which Douglas responded that defendant pulled the button from the bed during the second attack, threw it on the floor, and left without returning it.
Initially, although approximately seven hours had transpired between the time of the alleged attack and the time Douglas made the statements to Hollingsworth, "the lapse of time between the startling event and the out-of-court statement is not dispositive in the application of Evid.R. 803(2)." State v. Boston
(1989), 46 Ohio St.3d 108, 118. "Rather, the question is whether the declarant is still under the stress of nervous excitement from the event." Id. Douglas testified that she went to sleep shortly after the third attack due to the effects of her medication, and she did not awaken until she heard Hollingsworth enter the apartment. An intervening period of unconsciousness does not necessarily destroy the effect of a startling event on the mind of the declarant for the purpose of satisfying the exception. Statev. Wallace (1988), 37 Ohio St.3d 87, paragraph one of the syllabus.
Douglas' condition when Hollingsworth arrived demonstrates that Douglas was still under the stress of the attack. Hollingsworth described Douglas as "traumatized." Douglas' eyes were bulging and her legs were spread apart because her spastic condition negated her limited ability to close them. Accordingly, Douglas' initial, spontaneous relation that she had been attacked three times qualifies as an excited utterance.
Defendant nonetheless contends that the remaining two hearsay statements Hollingsworth related were not excited utterances under this court's opinion in State v. Minturn (Dec. 20, 1994), Franklin App. No. 94APA04-532, unreported (1994 Opinions 5873). In Minturn, a rape victim's statements to her friend concerning the details of the attack did not qualify as excited utterances because the friend's questions elicited the statements, and the statements consisted of reflective narrative rather than exclamations. Minturn relied on Wallace, supra, which held that:
 The admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over declarant's reflective faculties. Wallace, supra, paragraph two of the syllabus.
Here, as in Wallace, Douglas initiated the interaction with Hollingsworth by stating that she had been attacked three times. Hollingsworth's inquiry about how Douglas was attacked, or whether she was raped, facilitated Douglas' expression rather than caused reflection. Hollingsworth's inquiry neither negated the spontaneity of Douglas' declaration, nor was it "calculated to elicit information which would otherwise have been withheld." SeeWallace, supra, at 91 (quoting State v. Watson (Iowa 1976),242 N.W.2d 702, 204). Accordingly, the trial court reasonably found that Douglas' identification of defendant as her assailant in response to Hollingsworth's inquiry was the unreflective expression of her belief while still under the excitement of the assault. Wallace, supra; State v. Johnson (1994), 71 Ohio St.3d 332,338.
The third statement Hollingsworth related to the jury, concerning the emergency call button, is different. Hollingsworth left the apartment and summoned emergency personnel, then returned and asked Douglas why the emergency call button was on the dining room table. Douglas did not spontaneously offer any information about the call button; rather, Hollingsworth initiated the conversation. Hollingsworth's question did not facilitate Douglas' expression of what was already the natural focus of Douglas' immediately expressed thoughts, but was calculated to satisfy Hollingsworth's curiosity as to the broken condition and location of the call button. Accordingly, Douglas' statement concerning defendant's taking the call button from her bed consisted of reflective thought, rather than an excited utterance. The trial court erred in admitting Hollingsworth's testimony relative to that statement.
2. Detective Holmes
Defendant challenges Detective Holmes' testimony on similar grounds. After an extensive discussion off the record concerning the excited utterance exception, the trial court permitted Holmes to testify at length to what Douglas told him about the attack, and his testimony corresponded with many of the details about which Douglas had testified earlier. By the time Detective Holmes interviewed Douglas at the hospital, the nervous excitement caused by the attack had lost its domination over Douglas' reflective faculties, allowing her to reflect upon the events that had transpired during the previous evening.
Detective Holmes testified that she interviewed Douglas at OSU hospital at approximately 10:30 a.m., roughly ten hours after the third attack allegedly occurred and three hours after Douglas told Hollingsworth about the attack. Douglas arrived in the emergency room at approximately 8:00 a.m., and Hollingsworth arrived in the emergency room approximately fifteen minutes later. According to Nurse Beck, when Hollingsworth arrived Douglas "seemed to be able to calm down with a familiar face." (Tr. 384.) Indeed, Hollingsworth testified that when she arrived at the emergency room, Douglas attempted to calm her and "kept telling [Hollingsworth] she was okay." (Tr. 189.) Although Detective Holmes testified that Douglas appeared "a little hyper," that she "seemed upset," and had difficulty talking without crying at various times during the interview, Nurse Beck, who observed the interview, testified that Douglas' excitement at that time resulted from Detective Holmes' questions.
A declarant's condition as "merely being upset" is not dispositive of whether the declarant's statements arose from the stress of the startling event rather than reflective thought.Taylor, supra, at 303. Because the record here demonstrates that Douglas' interview with Detective Holmes occurred after the stress of the attack lost its domination over Douglas' reflective faculties, Douglas' description of the attack was not an excited utterance. The trial court erred in allowing Detective Holmes to relate Douglas' hearsay statements to the jury.
C. Harmless or Prejudicial Error.
In summary, Douglas' hearsay statements related by Detective Holmes' testimony, as well as portions of Nurse Beck's and Hollingsworth's testimony, were improperly admitted. The issue thus resolves to whether defendant was prejudiced by the testimony, as error in admitting hearsay does not justify reversal where it is harmless. State v. Carter (1995), 72 Ohio St.3d 545,550 (citing State v. Sage (1987), 31 Ohio St.3d 173).
Notably, all of the improper hearsay testimony repeated the details of the attack Douglas had already related in her own testimony. Because defendant had an opportunity to cross-examine Douglas concerning the subject matter of the inadmissible hearsay testimony, and the jury could assess Douglas' demeanor as she related the details of the attack, two hearsay risks normally inherent in such statements were not present here. Cf. State v.Keenan (1998), 81 Ohio St.3d 133, 142 (citing California v. Green
(1970), 399 U.S. 149) (holding that the admission of hearsay does not violate the Confrontation Clause if the delcarant testifies at trial). Moreover, because the improper testimony from Detective Holmes, Nurse Beck, and Hollingsworth was cumulative of matters already properly before the jury, defendant was not prejudiced by the majority of that testimony. Clary, supra; State v. Miller
(1988), 43 Ohio App.3d 44, 47.
Specifically, the inadmissible portion of Hollingsworth's testimony concerned Douglas' statement that defendant dropped the emergency call button on the floor, attempted to find it with the flashlight, and told Douglas that he could not find it. Douglas related similar events during her own testimony, defendant's fingerprints were found on the flashlight, and defendant admitted that he dropped the call button on the floor, used the flashlight to find it, and placed the call button on the dining room table. Accordingly, defendant was not prejudiced by the improper introduction of Hollingsworth's hearsay testimony.
The portions of Detective Holmes' and Nurse Beck's testimony regarding Douglas' statements that defendant raped her three times and forced her to engage in fellatio were also cumulative. Douglas testified that defendant vaginally raped her three separate times and forced her to engage in fellatio during the second encounter, Hollingsworth properly testified that Douglas told her she had been attacked three times, and Nurse Beck and Dr. Seifferth properly testified that Douglas alleged three separate incidents of vaginal rape and two separate incidents of oral rape.
The testimony of Detective Holmes and Nurse Beck regarding defendant's identity as the attacker was cumulative of Douglas' identification of defendant as her attacker and Hollingsworth's testimony that Douglas identified defendant as the attacker the morning after the attacks occurred. Similarly, the inadmissible details Nurse Beck and Hollingsworth related concerning Douglas' night care provider's schedule were confirmed by Douglas, Hollingsworth, and night care provider Cynthia Jones. Accordingly, the admission of those specific instances of hearsay testimony does not warrant reversal of defendant's rape and kidnapping convictions.
Unlike the foregoing testimony, Detective Holmes' and Nurse Beck's testimony that Douglas said defendant entered and exited her apartment three separate times without her consent is not supported by any evidence other than Douglas' testimony. Defendant's convictions of aggravated burglary and burglary were based, in part, upon the prejudicial hearsay testimony of Holmes and Beck. Trespass by force, stealth, or deception is an element of burglary and aggravated burglary under R.C. 2911.10 and2911.11. Nurse Beck's and Detective Holmes' testimony that Douglas told them defendant entered the unlocked apartment without her knowledge contradicted defendant's theory that he entered Douglas' apartment with her consent. Because Douglas' testimony was the only other evidence to support the element of trespass by force, stealth, or deception, the trial court's error in admitting the hearsay testimony of Nurse Beck and Detective Holmes prejudices defendant and merits reversal of his convictions of burglary and aggravated burglary. Cf. Keenan, supra, at 142 (indicating that nonconstitutional error is harmless where there is substantial
other evidence to support a guilty verdict).
For the foregoing reasons, defendant's first assignment of error is overruled as to his convictions for rape and kidnapping, as well as the specifications under those convictions, and is sustained as to his conviction for burglary and the two convictions for aggravated burglary.
Defendant's second and third assignments of error are interrelated and will be addressed jointly. Together they assert the trial court erred in permitting the prosecutor to cross-examine defendant regarding statements he made to investigating officers during an investigatory interview.
Defendant initially contends the prosecution's inquiry concerning incidents of his allegedly attacking his wife and a woman in Zanesville, Ohio, elicited impermissible character evidence in violation of Evid.R. 404(A). Specifically, the colloquy was as follows:
 [Defendant]: * * * [I]f this was a case of being into hurting people I'd have a record of it; isn't that right?
[Prosecutor]: Depends.
 [Defendant]: On what? I mean, there's not a person out there in Columbus that can say, oh he just jumped on this person or he did that to this person for no reason, or I haven't [hurt] anybody. (Tr. 564.)
The trial court then permitted the prosecutor, over repeated objections, to inquire whether defendant is aware that his wife has accused him of causing deafness in her left ear.
The state contends defendant placed his character in issue by testifying he would never hurt anyone. Evid.R. 404(A) (1) permits the prosecution to rebut the defendant's use of positive character evidence with evidence of a pertinent trait of defendant's character. Evid.R. 405(B) allows the prosecutor to utilize specific instances of the defendant's conduct on cross-examination. Accordingly, the trial court acted within its discretion in allowing the prosecution to inquire about defendant's allegedly harmful actions against his wife to rebut defendant's assertion that he would not harm anyone.
Defendant also challenges the prosecution's reference to "the girl in Zanesville." Because the trial court sustained defendant's objection regarding that question, defendant suffered no prejudice from the question alone. The trial court instructed the jury to disregard, for evidentiary purposes, statements the attorneys made and to refrain from speculating as to what the answer to a question might have been had the court allowed a response.
Defendant also asserts the trial court erred in allowing the prosecutor to inquire on cross-examination regarding defendant's statements to investigating officers that he "feels like killing people and hurting people," (Tr. 563) that he "wanted to buck somebody," (Tr. 562) and that he "see[s] [the police officer] laying on a couch with blood." (Tr. 564.) Defense counsel did not object to those questions; they therefore cannot serve as grounds for reversal absent plain error. State v. Campbell (1994),69 Ohio St.3d 38, 40. Plain error should be recognized only under exceptional circumstances and to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Moreover, the error complained of must be of such a nature that, but for the error, the outcome of the trial would clearly have been otherwise. Id.
Here, even if admission of defendant's statements was error, the evidence against defendant compels the conclusion that the outcome of the trial would not clearly have been otherwise but for the error. Douglas' testimony is corroborated in many respects by physical evidence and the facts related by the prosecution's witnesses. Conversely, defendant's defense of consensual sexual intercourse is riddled with inconsistencies.
For example, Siders testified that Douglas answered the door in her wheelchair when Siders and defendant arrived at Douglas' apartment, yet defendant testified that Douglas told them to enter the apartment while she was in bed. Even though the care provider had already left, rendering Douglas incapable of getting into or out of bed by herself, Siders testified that defendant and Douglas got into bed together immediately prior to engaging in consensual sex, never mentioning the Hoyer lifting device required to move Douglas from her wheelchair to the bed. Moreover, defendant testified that he had previously engaged in consensual sexual intercourse with Douglas on one prior occasion, yet Edward Barnett testified that defendant told him he had engaged in sexual intercourse with Douglas approximately twenty times since 1992. Finally, defendant admitted during cross-examination that he did not stop his attempts to engage in sexual intercourse with Douglas after she told him to stop.
Given the strength of the prosecution's case and the inconsistencies in defendant's defense, the jury did not likely convict defendant based on the evidence that defendant showed aggressive tendencies during his investigatory interview. Accordingly, the trial court did not commit plain error in the admission of that evidence, notwithstanding the fact that it arguably constituted improper other acts evidence in violation of Evid.R. 404(A).
Based on the foregoing, defendant's second and third assignments of error are overruled.
Defendant's fourth assignment of error contends that his conviction is not supported by the evidence and is against the manifest weight of the evidence. The standard of review for sufficiency of the evidence is whether, construing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins
(1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.
The test for determining whether a conviction is against the manifest weight of the evidence differs somewhat from the test applied to determine sufficiency of the evidence. In a review for manifest weight of the evidence, the evidence is not construed most strongly in favor of the prosecution, but the court engages in a limited weighing of the evidence to determine whether sufficient, competent, credible evidence exists to convince a reasonable trier of fact of defendant's guilt beyond a reasonable doubt. See State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported (1993 Opinions 5437). "Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"Thompkins, supra, at 387 (emphasis sic) (quoting Black's Law Dictionary (6 ed. 1990) at 1594).
Our disposition of defendant's first assignment of error renders defendant's fourth assignment of error moot as to defendant's convictions for aggravated burglary and burglary. Accordingly, we decline to address defendant's burglary and aggravated burglary convictions under his fourth assignment of error. App.R. 12(A) (1) (c).
Defendant's arguments under the fourth assignment concerning his rape and kidnapping convictions concern similar issues and will be addressed together. Regarding the three rape convictions, R.C. 2907.02(A) (2), states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male or female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex * * * ." Regarding the kidnapping conviction, R.C. 2905.01 states, in pertinent part:
 (A) No person, by force, threat, or deception * * * shall * * * restrain the liberty of [another] person, for any of the following purposes:
* * *
 (2) To facilitate the commission of any felony or flight thereafter;
* * *
 (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will * * * [.]
As stated in disposing of defendant's first assignment of error, Douglas testified that defendant vaginally raped her three separate times and forced her to engage in fellatio during the second encounter, Hollingsworth indicated that Douglas told her she had been attacked three times, and Nurse Beck and Dr. Seifferth testified that Douglas alleged three separate incidents of vaginal rape and two separate incidents of oral rape. Douglas stated defendant's body weight restrained her limited capacity to resist during both incidents of vaginal rape, and she told him to stop before and during each incident. Moreover, defendant admitted that he engaged in sexual intercourse with Douglas even though Douglas told him to stop.
Viewed in a light most favorable to the prosecution, the foregoing evidence allows a rational trier of fact to have found the essential elements of three separate incidents of rape and a charge of kidnapping proven beyond a reasonable doubt. Accordingly, defendant's claim that his rape and kidnapping convictions are not supported by sufficient evidence is unpersuasive.
Defendant's manifest weight argument is similarly unpersuasive. As noted, defendant's defense was contradicted by the physical evidence and the testimony of the state's witnesses. Moreover, defendant's supporting witnesses contradicted his own testimony. Conversely, Douglas' testimony is supported in great detail by the physical evidence and the testimony of every prosecution witness. While the evidence does reflect that Douglas failed to utilize her emergency call button after the first attack and before defendant placed the device beyond her reach, her failure to summon assistance may be found reasonable considering her testimony that she believed the attack had concluded, her medication made her drowsy, and she was not thinking clearly as a result of the first attack.
Because the greater amount of credible evidence supports defendant's convictions for rape and kidnapping, defendant's convictions for kidnapping and rape are not against the manifest weight of the evidence.
Regarding the sexual motivation specification corresponding to defendant's kidnapping conviction, R.C. 2941.147
indicates that "sexual motivation" has the same meaning as in R.C.2971.01. R.C. 2971.01(J), in turn, indicates that "[s]exual motivation means a purpose to gratify the sexual needs or desires of the offender." Here, Douglas testified that defendant demanded fellatio prior to the first attack, which involved a vaginal rape, and prior to the second attack, which involved oral and vaginal rape. Defendant's restraint of Douglas accommodated two separate incidents of vaginal rape. Accordingly, the evidence supports a reasonable conclusion that defendant restrained Douglas' liberty to gratify his sexual needs or desires. Defendant's fourth assignment of error therefore lacks merit as to the sexual motivation specification.
D. Sexually violent predator specification.
1. Double Jeopardy.
Before reaching defendant's sufficiency and manifest weight arguments concerning the jury's finding that defendant is a sexually violent predator, we address his constitutional challenges to that specification. Defendant's fifth assignment of error alleges the sexually violent predator specification imposes multiple punishments for the same offense in violation of the prohibitions against double jeopardy in both the Ohio and the United States Constitutions.
The Fifth Amendment to the United States Constitution provides: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb[.]" It applies to the states through the Fourteenth Amendment. Benton v. Maryland
(1969), 395 U.S. 784; State v. Gustafson (1996), 76 Ohio St.3d 425,432. Section 10, Article I, Ohio Constitution provides "no person shall be twice put in jeopardy for the same offense." Among other things, both clauses protect against multiple punishments for the same offense. Shearman v. Van Camp (1992), 64 Ohio St.3d 468,469. The safeguards provided by the double jeopardy clauses of the Ohio and United States Constitutions are co-extensive.Gustafson, supra.
After the jury returned its guilty verdicts, the trial court held a separate sexually violent predator hearing in which all the evidence, exhibits and testimony that had been introduced at the trial were admitted. On that evidence, the jury then found defendant to be a sexually violent predator as to all three rape convictions. Accordingly, pursuant to R.C. 2971.03(A) (3) the trial court imposed an enhanced sentence on defendant. Under R.C.2929.14(A), the maximum prison sentence for a conviction of rape, a felony of the first degree, is ten years. However, due to the sexually violent predator specification, defendant was sentenced to a term of imprisonment of ten years to life on each rape conviction. Defendant argues the statutory scheme imposes multiple punishments for the same offense and is therefore a violation of his protections against double jeopardy.
Defendant was sentenced to an indefinite term of imprisonment of ten years to life only on the underlying convictions. No separate sentence was imposed for the specification. See State v. Witwer (1992), 64 Ohio St.3d 421, 428
(upholding, on constitutional grounds, the imposition of an indefinite term of imprisonment on underlying conviction imposed when defendant also found guilty of specification under former R.C. 2941.143). While the specification enhanced the sentence, no separate sentence was imposed for the specification. The specification simply imposes a longer and enhanced sentence for the conviction of the underlying crime; it does not impose a separate sentence. "What subjects the accused to the more severe sentence is the nature of the felony which has been committed, not the specification." Id. at 429; see, also, State v. Blankenship
(1995), 102 Ohio App.3d 534, 547 (finding that an enhanced sentence due to a firearm specification did not violate double jeopardy protections). Defendant's double jeopardy concerns are not well-taken and are overruled.
2. Vagueness.
Defendant's sixth assignment of error contends the sexually violent predator specification is unconstitutionally vague because it fails to provide specific guidance to a jury in determining whether a defendant is a sexually violent predator. A statute is invalid when it is "so vague that men of common intelligence must necessarily guess at its meaning." Connally v.General Const. Co. (1926), 269 U.S. 385, 391. A statute is not impermissibly vague merely because different fact finders might possibly reach different results based on the same evidence. Smithv. United States (1977), 431 U.S. 291, 308-309; State v. Chappell
(Feb. 24, 1998), Franklin App. No. 97APA04-543, unreported (1998 Opinions 357). A vagueness challenge requires a court to determine whether the statute "(1) provides sufficient notice of its proscriptions and (2) contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement." Perez v. Cleveland (1997), 78 Ohio St.3d 376, 378. Because the provisions defendant challenges do not actually prohibit conduct, we must determine whether they are reasonably clear so as to prevent arbitrary or discriminatory application.Id. at 378.
R.C. 2971.01(H) (2) provides factors that the trier of fact may consider in determining whether a defendant is a sexually violent predator. Defendant argues that even with these factors, any decision by the jury would be an arbitrary conviction, as the factors require the jury to make a finding based on speculation. By analogy, however, in a sexual predator hearing a judge must determine whether a defendant is likely to engage in sexually oriented offenses in the future. In making that determination, the judge is given certain factors that he or she must consider. R.C.2950.09(B) (2). This court has repeatedly affirmed that statute against vagueness challenges. Chappell, supra; State v. Lambert
(May 25, 1999), Franklin App. No. 98AP-941, unreported (1999 Opinions 1376).
For similar reasons, the scheme involved in determining defendant to be a sexually violent predator is not vague. The factors listed in R.C. 2971.01(H) (2) are reasonably clear and provide sufficient guidance to the jury to determine whether a defendant is likely to commit a sexually violent offense in the future. As this court noted in previous cases dealing with sexual predators, the past is an important indicator of future behavior, and all of the factors regard the defendant's past actions. SeeState v. Johnson (Sept. 24, 1998), Franklin App. No. 97APA12-1585, unreported (1998 Opinions 4551) ("Although the court is essentially determining the offender's propensity to engage in future behavior at a sexual predator hearing, a trier of fact can look at past behavior as well, because past behavior is often an important indicator of future propensity"); see, also, Kansas v.Hendricks (1997), 521 U.S. 346.
Accordingly, the statute is not impermissibly vague and defendant's sixth assignment of error is overruled.
3. Sufficiency and Manifest Weight of the Evidence.
Having overruled defendant's constitutional claims as they relate to the sexually violent predator specification, we address that portion of defendant's fourth assignment of error contending his conviction on the sexually violent predator specification is not supported by sufficient evidence and is against the manifest weight of the evidence.
Here, the state was required to prove to the jury beyond a reasonable doubt that defendant is a sexually violent predator. Pursuant to R.C. 2971.01(H) (1), a sexually violent predator is defined as "a person who has been convicted of or pleaded guilty to committing, on or after the effective date of this section, a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." A sexually violent offense is defined in R.C. 2971.01(G) as a "violent sex offense, or a designated homicide, assault, or kidnapping offense for which the offender also was convicted of or pleaded guilty to a sexual motivation specification." In determining whether defendant is a sexually violent predator, the jury may consider the six factors set forth in R.C. 2971.01(H) (2):
 (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
 (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
 (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
 (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
 (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
(f) Any other relevant evidence.
At the specification hearing, the prosecution submitted all of the evidence that had been presented to the jury at trial, admitting "that short of maybe the third factor talking about chronically committing offenses with a sexual motivation, I'm sure that you could tell when I listed these things that none of the other ones you have been given evidence on, so its really the sixth category that we will be focusing on and any other relevant factors." (Tr. 738.) As the prosecution acknowledged, no evidence was presented on the factors found in R.C. 2971.01(H) (2) (a), (b) or (d), and minimal evidence was presented on the factors in (c) and (e).
Even when viewed in a light most favorable to the prosecution, the evidence provided is not sufficient to find beyond a reasonable doubt that defendant is a sexually violent predator. The prosecution argued nothing more than the facts of the underlying crime and isolated statements defendant made that he thought of sex often and wanted to hurt people. No evidence showed that defendant had committed any prior sexual offenses, R.C. 2971.01(H) (2) (a), and without any such prior offenses, no evidence showed that defendant committed any prior offenses with a sexual motivation. R.C. 2971.01(H) (2) (c). No torture or ritualistic acts were involved in the underlying crime, or that defendant engaged in any deviant sexual behavior. R.C.2971.01(H) (2) (d).
While defendant's conduct was egregious and reprehensible, all violent sex offenses are. Nonetheless, not all violent sexual offenders are to be classified as sexually violent predators. Only offenders that are proven to be likely to engage in future sexually violent offenses may be so classified. Proof generally consists of more than simply the underlying facts of the crime, as horrendous as those facts may be. Cf. State v. Baughman
(May 4, 1999), Franklin App. No. 98AP-929, unreported (1999 Opinions 1032). ("However, a trial court cannot find an offender a sexual predator solely on facts arising from the underlying offense. State v. Ward (Jan. 28, 1999), Cuyahoga App. No. 72371, unreported. Had the legislature intended to rely solely on the underlying offense in sexual predator determinations, it would have done away with sexual predator determination hearings and simply classified any person committing a sexually oriented offense as a sexual predator." Id.)
The prosecution presented insufficient evidence for a rational trier of fact to find that defendant was a sexually violent predator beyond a reasonable doubt. For that reason, we sustain defendant's fourth assignment of error as it relates to the finding that he is a sexually violent predator.
Having overruled defendant's second, third, fifth, and sixth assignments of error, and overruled in part and sustained in part defendant's first and fourth assignments of error, we affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part; case remanded.
PETREE and KENNEDY, JJ., concur.