The STATE of Ohio, Appellee,

v.

CLARY, Appellant.

[Cite as *State v. Clary* (1991), 73 Ohio App.3d 42.]

Court of Appeals of Ohio,
Franklin County.

90AP–1248.

Decided April 9, 1991.

44

*Michael Miller,* Prosecuting Attorney, and *Joyce S. Anderson,* for appellee.
*James Kura,* Public Defender, and *Paul Skendelas,* for appellant.

PETREE, Judge.

Defendant Charles Clary was convicted by a jury in the Franklin County Court of Common Pleas of the crime of rape. Defendant asserts the following assignments of error:

"I. Appellant was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States and by Article I, Section 10 of the Constitution of the State of Ohio

through counsel's failure to move to dismiss on the grounds that appellant was denied his right to a speedy trial.

"II. The trial court erred by permitting the state to introduce hearsay testimony through a physician when the testimony was not pertinent to a medical diagnosis or treatment.

"III. Appellant's conviction was not supported by sufficient credible evidence and was against the manifest weight of the evidence. This deprived appellant of Due Process of Law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution."

In his first assignment of error, defendant maintains that he was denied effective assistance of counsel because his appointed attorney failed to file a motion to dismiss on speedy trial grounds.

Both the Sixth Amendment of the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee criminal defendants the right to counsel. Moreover, as courts have long recognized, the right to counsel is in fact the right to effective assistance of counsel. *Powell v. Alabama* (1932), 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158, 162. This right thus ensures that, under all the circumstances, the accused had a fair trial and substantial justice was done. *State v. Hester* (1976), 45 Ohio St.2d 71, 79, 74 O.O.2d 156, 160, 341 N.E.2d 304, 309.

To determine whether a defendant has been denied effective assistance of counsel, the courts have fashioned a two-pronged test. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Lytle* (1976), 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154. The first prong of the test requires an analysis of whether " * * * there has been a substantial violation of any of defense counsel's essential duties to his client. * * * " *Lytle, supra,* 48 Ohio St.2d at 396, 2 O.O.3d at 498, 358 N.E.2d at 627. If there was such a violation, then the second prong of the test requires an inquiry into " * * * whether the defense was prejudiced by counsel's ineffectiveness." *Id.* at 397, 2 O.O.3d at 498, 358 N.E.2d at 627.

Hence, the threshold question presented is whether defense counsel substantially violated an essential duty to defendant by refraining from filing a motion to dismiss on speedy trial grounds.

The defendant's speedy trial rights emanate from constitutional and statutory law. The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution contain similar speedy trial guarantees. In addition, in an effort to prescribe reasonable speedy trial periods, the

General Assembly has enacted R.C. 2945.71 *et seq.* See *State v. O'Brien* (1987), 34 Ohio St.3d 7, 8, 516 N.E.2d 218, 219.

In the present case, the parties do not dispute that, pursuant to R.C. 2945.71(C)(2) and (E), defendant was entitled to be brought to trial on the charges in question within ninety days of his arrest, but this did not occur. The dispute herein involves the legal effect of several continuances which delayed the commencement of defendant's trial.

The record reveals that defendant was arrested on March 9, 1990 and was never released on bond. Initially, his trial was set for May 21, 1990, but the parties and trial judge signed an entry on May 24, 1990 continuing the trial until July 30, 1990 because a joinder issue had to be resolved. This entry, like the others in this case, includes the following waiver language:

"Defendant waives the right to a speedy trial for the period of this continuance as to the pending charge or charges * * *."

Thereafter, two similar entries were journalized on July 30, 1990 and September 4, 1990. The July entry continued the case until September 4, 1990 and the September entry continued the case until September 24, 1990. Ultimately, defendant's trial commenced on September 25, 1990.

Defendant argues that counsel should have moved to dismiss the indictment because the July and September continuances (a total of fifty-six days for speedy trial purposes) could not have tolled the speedy trial provision under R.C. 2945.72(H), which governs " * * * reasonable continuance[s] granted other than upon the accused's own motion." Defendant relies on several cases involving improper continuances granted on account of court administration difficulties, see, *e.g., State v. Pudlock* (1975), 44 Ohio St.2d 104, 73 O.O.2d 357, 338 N.E.2d 524, to support his theory that defense counsel should have recognized a speedy trial defense.

To be sure, both the July and September continuances were predicated on administrative difficulties. As specifically reflected on the entries, in July the court was in trial and no other courtroom was available. Likewise, in September the court was again in trial and the judge was unavailable.

Nevertheless, defendant's reliance on the *sua sponte* continuance cases is misplaced. Each of the entries here, which were signed by defendant, include an express waiver of definite duration that in effect was made by defendant. See R.C. 2945.72(E).

"As with other fundamental rights, a defendant can waive the right to a speedy trial. * * * " *State v. Adams* (1989), 43 Ohio St.3d 67, 69, 538 N.E.2d 1025, 1027; *State v. Kidd* (1978), 60 Ohio App.2d 374, 14 O.O.3d 326, 397 N.E.2d 768. See, also, *State v. Saunders* (1984), 23 Ohio App.3d 69, 23 OBR

132, 491 N.E.2d 313. Furthermore, "[a]n accused's express written waiver of his statutory rights to a speedy trial as provided in R.C. 2945.71 *et seq.*, if knowingly and voluntarily made, may also constitute a waiver of the coextensive speedy trial rights guaranteed by the United States and Ohio Constitutions." *O'Brien, supra,* paragraph one of the syllabus.

Accordingly, on the record presented defendant must be said to have waived his speedy trial rights.[1] In fact, he could not claim that the waivers were not knowingly or voluntarily made on the record herein. Such a claim involves consideration of evidence outside the record which should be tested by post-conviction proceedings under R.C. 2953.21. *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 4 OBR 580, 448 N.E.2d 452.

■ In light of the clear enforceability of the waivers in question, defendant's argument, reduced to its basics, is that trial counsel must file a motion to dismiss on speedy trial grounds in every case not tried within the statutory period, regardless of the merits of the defense. In actuality, then, defendant argues for a *per se* rule similar to the Hamilton County rule for motions to suppress. See *State v. Woolum* (1976), 47 Ohio App.2d 313, 1 O.O.3d 383, 354 N.E.2d 712.

Assuredly, the responsibilities of counsel extend to protecting the client's speedy trial rights. *State v. Gwinn* (July 17, 1981), Lucas App. No. L–80–277, unreported, 1981 WL 5717; *Comm. v. Roundtree* (1976), 469 Pa. 241, 364 A.2d 1359. But there is no good argument for framing a *per se* rule regarding speedy trial motions that are not supported by arguable grounds.

Indeed, the Cuyahoga County Court of Appeals rejected the *per se* rule of *Woolum* for motions to suppress. *State v. Gibson* (1980), 69 Ohio App.2d 91, 23 O.O.3d 130, 430 N.E.2d 954. In fact, this court followed *Gibson* and rejected the *Woolum* rule in *State v. Howard* (Apr. 13, 1982), Franklin App. No. 81AP–1005, unreported, 1982 WL 4101. Noting that *Lytle, supra,* in all likelihood effectively overruled *Woolum,* we expressly rejected any *per se* rule that would require counsel to file pretrial motions to suppress in death penalty cases. We reasoned:

" * * * Any rule of law that mandates the filing of obviously fruitless and time consuming motions, or requires the utilization of procedure which has reliably and professionally been determined to be futile, should be discouraged so the courts use their valuable time to deal with matters of arguable merit."

---

1. We note that defendant has not argued in any manner that he was not informed of his speedy trial rights.

Further, we recognized that such a rule would practically encourage defense counsel to strategically fail to file such motions, knowing that her client would automatically obtain a new trial.

The force of these arguments is equally applicable to the speedy trial motion, another potentially case-dispositive defense. Many courts are in accord. Annotation, Adequacy of Defense Counsel's Representation of Criminal Client Regarding Speedy Trial and Related Matters (1981), 6 A.L.R. 4th 1208, Section 4.

█ Furthermore, defendant cannot contend that his counsel never should have allowed him to accept a waiver. There are many legitimate as well as good tactical reasons to waive such a defense or to acquiesce in delay. Consequently, we find that on the record presented, defense counsel did not substantially violate any essential duty to his client.

Defendant's first assignment of error is not well taken.

In his second assignment of error, defendant argues that the trial court erred in admitting prejudicial hearsay testimony.

Dr. David Blissenbach, the examining emergency room physician on the night in question, testified on direct examination in the state's case-in-chief about a so-called patient history taken from the victim. His job is to diagnose and treat patients who present themselves with what they feel is an urgent or life-threatening condition.

Dr. Blissenbach explained that, pursuant to the standard rape examination protocol,[2] the nurse meets with the alleged rape victim to take vital signs, to make an initial assessment of the patient's immediate condition, and to prepare the patient for examination by the physician. Thereafter, the physician examines the patient. The physician begins with an examination for non-sexual, physical injuries and then proceeds to examine areas involved by the alleged rape or sexual assault. The physician's overall examination includes a standard pelvic exam, cultures to detect infection, swab samples to detect semen, and other procedures such as x-rays. On the basis of the examination, the physician treats the patient.

Part of the nurse's intake responsibilities includes writing down the so-called patient history on the triage portion of an emergency room form. Essentially, the nurse takes the victim's story down on a four-by-three-inch

---

2. St. Anthony's Hospital contracts with the city regarding rape victims. Whenever possible, Columbus brings such victims to this hospital. Dr. Blissenbach has seen seventy-five alleged victims since 1985, and often testifies for the state. The standard rape protocol is followed by the nurse, the doctor, and the detective.

space provided on the form. Likewise, the physician does the same, except the space on the form for his handwriting is twice as wide.

On direct examination, the prosecution asked Dr. Blissenbach if the entire history was taken for purposes of medical diagnosis or treatment, and the doctor said it was. Then, the prosecution questioned him about the history taken by the intake nurse on the triage portion of the patient history. Defense counsel objected, stating that the physician would be relating statements which he never took down. However, the court allowed him to relate the history that he took down. The physician testified that the victim said that she was raped orally and vaginally, punched in the face at least twice, and threatened with a knife.

When the prosecution asked whether the victim had said whether there was more than one assailant, defense counsel objected again. After a sidebar conference, the court allowed the testimony to continue, expressly citing Evid.R. 803(4). Reasoning that the purpose of the physician's exam was to detect semen or whether there was more than one rapist, and reasoning that the patient history was conducted in the regular business of the hospital and is a record upon which the doctor relies during the course of his examination, the court indicated that it would allow the physician to continue to testify from the history. Again, defense counsel objected, arguing that the history was inadmissible hearsay and not pertinent to medical diagnosis or treatment. But the trial court overruled the objection.

Dr. Blissenbach then related the history to the jury. In addition to noting the nurse's observations of injuries, he said that the victim said she was orally and vaginally assaulted by two men, that the victim saw a knife, that she was punched in the face twice, and that her life was threatened. He further testified that the victim's injuries were consistent with her story of being punched in the face twice.

Defendant contends that the physician should not have been allowed to relate the out-of-court statements of the victim, ostensibly recorded as "patient history" in response to questioning by medical staff. Defendant argues that certain of the objectionable hearsay statements were not pertinent to medical diagnosis or treatment for purposes of the hearsay exceptions contained in Evid.R. 803(4) and (6) and therefore, should have been excluded. Consequently, defendant argues that this prejudicial testimony served to improperly bolster the credibility of the victim and corroborate her story at trial.[3]

---

**3.** We note that the prosecution has not argued that this evidence was offered for reasons other than impermissible hearsay purpose, *i.e.,* that the events elicited occurred.

Preliminarily, we note the prosecution's argument that defense counsel failed to object with requisite specificity to the testimony in question. Assuredly, Evid.R. 103(A)(1) requires a timely objection stating the specific ground thereof, if the specific ground was not apparent from the context. In essence, one needs to make specific objections in order to apprise the trial court of potential error and preserve any error for appeal. Furthermore, "[t]he general rule regarding specific objections is that one who has made specific objections to the admission of evidence thereby waives all other objections and cannot assert such others in the appellate court. * * *" *Johnson v. English* (1966), 5 Ohio App.2d 109, 113, 34 O.O.2d 229, 232, 214 N.E.2d 254, 257.

Here, the record demonstrates that initially defense counsel objected on the basis that the doctor was testifying from notes he recorded and the doctor was allowed to testify that the victim said that she was raped orally and vaginally, punched in the face at least twice, and threatened with a knife. After the sidebar conference, where it is clear the court was apprised of the applicable rules, counsel expressly objected on the grounds cited in this appeal. Nevertheless, the physician was allowed to add that the victim stated she was raped by two men and that her life was threatened.

It appears that counsel initially did not perceive that the prior statements of the victim, even though she testified at trial, are nevertheless out-of-court statements made by an out-of-court declarant for purposes of the hearsay rule. His initial objection was aimed at the fact that the nurse was not testifying. Only later did he astutely realize that it is the victim at the time of the rape whom he could not contemporaneously cross-examine. But he came around and made the hearsay objection to preserve the error for review, at least with respect to the fact that there were two men and that the victim's life was threatened.

The law has for some time provided an exception to the hearsay rule for statements to physicians consulted for treatment. 6 Wigmore, Evidence (Chadbourn Rev. 1976), Sections 1719–1720; Cleary, McCormick on Evidence (1984) 839, Section 292; Annotation, Admissibility of Physician's Testimony as to Patient's Statements or Declarations, other than Res Gestae, During Medical Examination (1971), 37 A.L.R.3d 778. Today, Evid.R. 803(4) provides a hearsay exception applicable regardless of the availability of the declarant, which allows for the admission of:

"Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

As the Staff Notes to Evid.R. 803(4) point out, this exception, identical to its federal counterpart, represents an expansion of admissibility in this area. However, the Staff Notes also point out that the underlying rationale of the exception has remained the same; namely, the commonsense notion that you have a strong incentive to tell the truth and get it right when describing your condition to a doctor who could wield a sharp scalpel. See *Meaney v. United States* (C.A.2, 1940), 112 F.2d 538. The federal courts have recently recognized another rationale for the modern rule, based on Judge Weinstein's observations in his treatise—that if the patient's statements are good enough for a doctor to rely on in making life or death decisions, then they should be good enough for the courtroom. Weinstein & Berger, Weinstein's Evidence (1979), 803–129; see *United States v. Iron Shell* (C.A.8, 1980), 633 F.2d 77, and Annotation, Admissibility of Statements Made for Purposes of Medical Diagnosis or Treatment as Hearsay Exception under Rule 803(4) of the Federal Rules of Evidence (1987), 55 A.L.R.Fed. 664.

Notwithstanding the expansion of the rule, the Staff Notes point out a central concern in this area. The exception is founded on reasonableness and it should not serve as a conduit through which matters of no medical significance are admitted.

In accordance with the dual rationales for the exception, the *Iron Shell* case, which the prosecution has relied upon herein, established a two-part test to determine admissibility. First, the question is whether the declarant's motive is consistent with that of a patient seeking treatment. Second, the question is whether it is reasonable for the physician to rely on the information in diagnosis or treatment. *Id.*, 633 F.2d at 84. Compare Fed.R.Evid. 703 (basis of expert opinion testimony) with Evid.R. 703, regarding the "close parallels" envisioned by the *Iron Shell* court. *Id.*

██ We agree with some aspects of the *Iron Shell* court's analysis. To be sure, " * * * a close examination of the facts and circumstances in each case is required." *Id.* at 85, fn. 11. Moreover, some questions are clear. It is difficult to understand how identification or fault testimony could be admissible under the rule. *Id.* at 84. While many "what happened" statements would be entirely relevant to a physician, they pose troublesome questions.

Traditionally, Ohio courts have disallowed statements regarding the cause of an injury or the manner in which an accident happened insofar as not pertinent to medical diagnosis or treatment, and even more modern authorities have followed this common law tradition. *McQueen v. Goldey* (1984), 20 Ohio App.3d 41, 43, 20 OBR 44, 45, 484 N.E.2d 712, 715. See Evid.R. 102.

Indeed, this court followed *McQueen* in *Hatfield v. Andermatt* (1988), 54 Ohio App.3d 188, 191, 561 N.E.2d 1023, 1026, where we rejected the contention

that a plaintiff's statement to an emergency squad attendant that the plaintiff collided with a police cruiser pertained to the medical or surgical treatment of the plaintiff. Instead, we found that the statements pertained to the manner of the accident and therefore, were inadmissible.

Of course, in retrospect many facts communicated to a physician are in some tangential way pertinent to his examination, if not simply to rule out areas of inquiry. *Iron Shell, supra,* 633 F.2d at 84. But it is all too easy to construct post-hoc speculations as to why some fact would be part of a physician's examination and this serves as no protection against using the rule as an improper hearsay conduit.[4]

■■■■ Undue emphasis on the viewpoint of the physician only undermines the strength of this evidence. Rather, it is the viewpoint of the patient as to what the facts will mean to him or her in action that creates the incentive for truth. A court could require a physician to " * * * detail the relevancy of his questions * * *," as was emphasized in *Iron Shell, supra,* 633 F.2d at 84, or testify as to what "most doctors would have sought * * *," *id.,* but we think this loses sight of the fundamental justification for the exception: What really counts is what the patient thinks is relevant.[5]

■■■■■ In the present case, in light of circumstances surrounding the incident and severity of injuries involved, the fact that there was a threat to the victim's life cannot reasonably be said to be expected to effect any change in treatment or diagnosis by the attending physician with apparent attendant adverse consequences to the declarant. Likewise, the fact that there were two men involved, while significant to the physician's collection of semen for criminal analysis, cannot reasonably be said to affect treatment or diagnosis. Perhaps more costly tests would be performed, but this is not the kind of guarantee of trustworthiness that serves as the basis for the rule. Moreover, there is not any indication whatsoever that the physician directly or indirectly communicated any potential consequences to the patient which would bolster such trustworthiness.

Accordingly, we hold that the trial court abused its discretion on the record presented in allowing the statements in question.

---

**4.** We note that the interest of the hospital in this case to follow standard procedure or protocol diminishes the importance of the role of the physician as on-the-spot judge of the out-of-court statement, notwithstanding the intimations of *United States v. Iron Thunder* (C.A.8, 1983), 714 F.2d 765, 772, to the contrary.

**5.** Assuredly, if hearsay statements are elicited in response to interrogation by the physician during the course of his examination, the likelihood that the patient will speak the truth is enhanced. But in the present case, there is no indication that the nurse or doctor asked detailed questions.

Likewise, the court abused its discretion in permitting these statements under the so-called business records hearsay exception of Evid.R. 803(6). As we recognized in *Hatfield,* although medical records, properly authenticated, may be admissible into evidence, facts contained in the medical record not pertinent to medical diagnosis or treatment are nevertheless inadmissible. *Hatfield, supra,* 54 Ohio App.3d at 190, 561 N.E.2d at 1026: *Mastran v. Urichich* (1988), 37 Ohio St.3d 44, 48–49, 523 N.E.2d 509, 512–513; *McQueen, supra,* 20 Ohio App.3d at 43–44, 20 OBR at 45–47, 484 N.E.2d at 715–717.

For the aforementioned reasons, the statements in question are not pertinent to medical diagnosis or treatment and are therefore inadmissible as part of a business record.

Despite the error which occurred, it is incumbent on defendant to demonstrate he was prejudiced by the erroneous admission of the statements. *Hatfield, supra,* 54 Ohio App.3d at 191, 561 N.E.2d at 1026. Unlike the situation in *Hatfield,* where the statement admitted was the only evidence which served to corroborate the declarant's story, in this case, as was the case in *McQueen, supra,* the evidence was merely cumulative and therefore nonprejudicial. See, also, *State v. Miller* (1988), 43 Ohio App.3d 44, 47, 539 N.E.2d 693, 696.

The victim's friend and neighbor, whom the victim confided in immediately after the rape, testified in the state's case-in-chief that the victim told her she was raped by two men named Chuck and Cole, and that they hit her and threatened to kill her. Likewise, uniformed police officer Andy Painter was allowed to testify that the victim told him that she was raped by two men at knifepoint. In addition, sexual abuse squad detective Alfred Carder, who immediately responded to the rape call, also testified that the victim said she was raped by two men at knifepoint.

As the erroneously admitted testimony was manifestly cumulative, defendant was not prejudiced on the evidence presented.

Defendant's second assignment of error is not well taken.

In his third assignment of error, defendant contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

A reviewing court will not set aside a judgment of conviction if there is substantial evidence to support it. The reviewing court's function is to determine whether the evidence presented, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 10 O.O.3d 340, 341, 383 N.E.2d 132, 134. The

jury has the best view of the witnesses and therefore, evaluating the credibility of witnesses is primarily the function of the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212.

 Defendant contends that he established a strong alibi defense at trial which warrants a reversal of his conviction. The facts are as follows.

The victim in this case testified that she resided with her children in a one-floor apartment. She was dating an individual named Marvin, who lived in the same apartment complex. One night in January 1990, Marvin introduced her to two men: Cole Baughman and defendant, Charles "Chuck" Clary. Defendant was a metal worker and at one time was Marvin's boss.

The three men had been out drinking and returned to the victim's apartment. Unfortunately, Cole used some strong language in front of the victim, which upset Marvin. Consequently, Marvin exchanged harsh words with Cole and the two fought. Eventually, when Marvin got the better of Cole, defendant joined in and pummeled Marvin. The party ended.

Two days later, on January 20, defendant and Cole returned to the victim's apartment ostensibly seeking to apologize to Marvin. However, Marvin was nowhere to be found.

The three drank some beer which the two men had brought and then went out looking for Marvin. They went to several bars. At one bar, the victim danced with a stranger and defendant became upset and called her a "slut."

After this, the three returned around 2:00 a.m., not having found Marvin. Cole locked the door of the apartment and then grabbed the victim by the legs. Although she did not scream, she was punched in the face, which injured her lip. Defendant hit her again and then raped her, penetrating her. At one point, the victim "blacked out." When she awoke, there was a knife at her throat. After that, she complied with the men's demands for fellatio and intercourse. After the encounter, defendant threatened to kill her if she reported the incident.

When the men left, the victim ran to her friend Kathy Copeland's apartment and told her what had happened. The victim called the police and described her assailants and the events to the authorities. She was then taken to the St. Anthony's Hospital emergency room. Days later, she positively identified defendant and Cole from police photographs.

Kathy Copeland testified that on the night in question and prior to the rape, the victim asked her to watch her children. Kathy saw the two men who were with the victim. Later that evening (actually, early morning) Kathy heard people upstairs. Kathy corroborated the victim's account of her report of the

incident to Kathy. Kathy saw that the victim had been beaten. She identified defendant as one of the men she saw with the victim that night.

Two fingerprints were found in the apartment which matched with Cole Baughman but none were found which matched with defendant. The knife was never found.

Defendant presented an alibi defense, claiming that on the night in question he spent the entire evening with his common-law wife Jackie and her girl-friend Debbie at Debbie's apartment.

Jackie corroborated defendant's story. She also said she used to date Marvin, who had at one time accosted Cole with a gun.

Defendant admitted that he went over to the victim's apartment with Cole to find Marvin, but not on the night in question. He denied raping the victim. He also admitted that he was arrested the day before the alleged rape for driving while intoxicated. He said that he was confused about dates when he initially told the police about being arrested for drunk driving on the night of the rape.

Thomas Williams also testified briefly for defendant. Williams was a resident of the same apartment building as Jackie's girlfriend. He testified that on the night in question he saw defendant in the apartment hallway around 10:00 p.m., when a loud disturbance brought all the neighbors into the hallway. Williams felt certain that he had the right evening in mind because he had some friends over that particular evening.

Defendant emphasizes that Williams was an unbiased, alibi witness and that the victim had a motive to lie to avenge the beating of her boyfriend Marvin. However, these matters are for the jury to decide. The jury was entitled to discredit Mr. Williams. The testimony of the state's witnesses and the evidence presented, if believed, would constitute substantial evidence upon which reasonable minds could find beyond a reasonable doubt that defendant purposefully engaged in sexual conduct with the victim by force or threat of force in violation of R.C. 2907.02(A)(2). Consequently, the conviction was supported by sufficient evidence and was not against the manifest weight of the evidence.

Defendant's third assignment of error is not well taken.

For the foregoing reasons, the assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STRASBAUGH and REILLY, JJ., concur.

ARCHER E. REILLY, J., retired, of the Tenth Appellate District, sitting by assignment.