[Cite as *State v. Knauff*, 2011-Ohio-2725.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 10CA900 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| Travis Knauff, | : | |
| Defendant-Appellant. | : | **RELEASED 05/24/11** |

_____

APPEARANCES:

Samuel H. Shamansky, Samuel H. Shamansky Co., LPA, Columbus, Ohio, for appellant.

Aaron E. Haslam, Adams County Prosecutor, and Mark R. Weaver, Adams County Assistant Prosecutor, West Union, Ohio, for appellee.

_____

Harsha, P.J.

**{¶1}** Travis Knauff appeals his conviction for the rape of his five-year-old daughter. Knauff contends that the trial court erred by admitting a video-recorded interview in which his daughter described the sexual abuse to a social worker at Cincinnati Children's Hospital. We conclude that the video was admissible under the hearsay exception for statements made for medical diagnosis or treatment; all statements contained in it were reasonably pertinent to assisting medical professionals with determining a course of physical and mental health treatment for the young child. And because the victim testified and was available for cross-examination, no violation of the Confrontation Clause occurred.

**{¶2}** Knauff also contends that the trial court violated the Confrontation Clause by allowing the victim to testify in the court's chamber via closed-circuit television. The

court invoked the procedures outlined in R.C. 2945.481(E)(2) and found that the victim expressed "extreme fear" of her father and could not testify in his presence, necessitating the use of the closed-circuit television procedure. The statute advances two important public policy goals, i.e., the protection of child sex abuse victims from experiencing further trauma by testifying in the presence of their abuser, and ensuring that the child victim is able to communicate his or her testimony openly and honestly. Moreover, the closed-circuit television procedure ensured the reliability of the adversarial process as the victim was subject to cross-examination under oath, and both Knauff and the jurors were able to observe her demeanor while testifying. Therefore it passes constitutional muster.

## I. Summary of the Evidence at Trial

{¶3} Travis Knauff and Alisha Knauff were previously married, but divorced before the incident. According to Alisha, their daughter D.K. accused Knauff of molesting her at his trailer during his parental visitation.

{¶4} After Alisha contacted the Adams County Sheriff's Department, Detective Jim Heitkemper referred her to the Mayerson Clinic at Cincinnati Children's Hospital for an evaluation. There, social worker Cecelia Friehofer recorded a one-hour interview with D.K. During the interview, D.K. revealed that her father engaged in sexual conduct with her in his bedroom, living room, and in a "forest." She also revealed that she spit Knauff's "pee" into a hole in his bedroom floor. The interview covered a broad range of details related to the abuse.

{¶5} Friehofer summarized what D.K. told her to Dr. Bob Shapiro, who conducted a physical examination. Dr. Shapiro examined D.K. visually and observed

nothing out of the ordinary. He testified that he would not have expected to observe any physical signs of sexual contact given that the incident occurred three months prior.

{¶6} Friehofer faxed a report of the interview to Detective Heitkemper, who then obtained and executed two search warrants for Knauff's residence. Executing the first search warrant, Heitkemper removed the portion of the floor containing the hole and a section of pink insulation found underneath the hole. Through the second search warrant, Heitkemper obtained Knauff's DNA by swabbing his mouth. The Sheriff's Office sent the physical evidence from the trailer and DNA swabs of both Knauff and D.K. to the Ohio Bureau of Criminal Identification (BCI) for analysis.

{¶7} Two BCI employees testified about their findings. The first, a "forensic biologist," testified that her analysis revealed that the insulation contained a combination of both semen and "amylase," which is a substance found in saliva. The second BCI employee conducted DNA testing on the insulation and compared his findings to the DNA samples obtained from Knauff and D.K. He concluded that the sample contained a "major DNA profile," which matched Knauff's DNA. The employee also found a "minor DNA profile" which he could not associate with any individual. He could not reach a conclusion about whether the minor profile belonged to D.K. The employee explained that the minor profile had insufficient DNA information to provide him with the ability to make a comparison. On cross-examination, the employee testified that the information contained in the minor profile could arguably support the conclusion that the unknown or "foreign" DNA came from as many as four different contributors.

{¶8} D.K., who was five-years-old, testified at trial. When the prosecutor asked her about the abuse, she became non-responsive and indicated that she was scared.

The prosecutor attempted to calm her down but she repeatedly conveyed that she was too scared to testify about the alleged abuse. The court eventually questioned D.K. about her level of fear and asked her what was causing it. She stated that she was scared because of "everyone" in the courtroom and because of her father's presence. When asked to describe her level of fear in terms of a one to ten scale, D.K. responded that she was "real, real, real scared."

{¶9} The prosecutor asked D.K. if she thought she could testify in the judge's chambers, with only the judge, the state's attorney and the defense counsel present. She said she could. The court then made a finding on the record that D.K. had expressed "extreme fear" that was preventing her from testifying in open court. The court invoked the procedures set forth in R.C. 2945.481(E) for conducting an examination of a child sex abuse witness outside of the courtroom via closed-circuit television.

{¶10} The state continued D.K.'s direct examination in the judge's chambers with the judge and defense counsel present. Court staff used a closed-circuit video system to broadcast D.K.'s testimony to the courtroom, where the jurors and Knauff remained. The record reflects that Knauff could speak to defense counsel during D.K.'s direct examination by the use of a cell phone. On direct, D.K. testified that Knauff stuck his finger in her "pee pee" and her "butt," and that she spit his "pee" in a hole in the floor and the toilet. Defense counsel briefly cross-examined D.K., mainly to clarify whether she told her mother about the abuse allegations first, or whether her mother asked her about the allegations. D.K.'s response was, essentially, she told her mother because otherwise she would not know.

**{¶11}** Friehofer testified and discussed the general methodology behind the "forensic interview" that she conducted with D.K. She explained that one purpose of the lengthy interview was to gain as much information as possible so that D.K. would not have to discuss the abuse with others. Friehofer explained that another purpose of the interview was to gain information so that medical staff could make appropriate decisions concerning necessary physical or mental health treatment.

**{¶12}** At the conclusion of Friehofer's testimony, the state played the interview for the jury. Court staff fast-forwarded or muted at least two portions of the interview, apparently in response to an agreement by the prosecutor and defense counsel. The record contains both the complete video-recorded interview and the redacted version.

**{¶13}** The interview played for the jurors lasted approximately 50 minutes as D.K. describes repetitively, and in detail, the sexual abuse. She alleged that the majority of the abuse occurred in Knauff's bedroom and in the living room. In her own words, she described acts of digital penetration, cunnilingus, and fellatio. She said that Knauff told her to swallow his "pee" but that she refused. She said she spit his "pee" in a hole in his bedroom floor. D.K. additionally described an act of fellatio that occurred in a "forest" while on a trip to Wal-Mart.

**{¶14}** D.K. described the frequency of the abuse, which she said happened "a lot" and "whenever she stayed the night." D.K. also described specifically where the abuse occurred, and what bodily position she and Knauff would be in when it occurred. D.K. told Friehofer that Knauff would place a "baby box" in front of the door so that no one would enter the room. D.K. stated that during the encounters, she would have her

Adams App. No. 10CA900

pants and underwear off and Knauff would remain clothed. When the abuse was over, Knauff would put her clothes back on.

{¶15} D.K. also told Friehofer that sometimes other individuals were in the trailer during the abuse. She claimed that Knauff's girlfriend, Jerrylyn Mounts, was "always" outside on the porch, smoking a cigarette. Her Uncle Sonny Knauff and her Grandma were in their respective bedrooms.

{¶16} The defense introduced the testimony of Jerrylyn Younts. She claimed that she never went outside to smoke cigarettes and would open a window in the living room and blow smoke out of it. She also testified that Knauff was never alone with D.K. in the three or so weeks D.K. stayed with Knauff and his family at the trailer. She admitted, however, that during the day she was away from the trailer at her job.

{¶17} When Knauff testified, he denied any sexual abuse occurred and claimed that D.K. was a liar. Knauff also testified that he was never alone with D.K. And he indicated that his relationship with Alisha Knauff was "very poor." On cross-examination, Knauff admitted that he did not have a job and stayed at home during the month of June 2009. He did not dispute that the insulation located underneath the hole in the floor contained his semen. On re-direct, Knauff claimed that he masturbated into the hole after becoming aroused by observing his girlfriend in the shower. Knauff admitted on re-cross that he previously told only his defense counsel the story about masturbating into the hole.

{¶18} Jurors convicted Knauff of one count of rape, in violation of R.C. 2907.02(A)(1)(b). After the court sentenced him to life in prison without parole eligibility, he filed this timely appeal.

Adams App. No. 10CA900

## II. Assignments of Error

**{¶19}** Knauff submits two assignments of error for our review:

Assignment of Error No. 1:

THE TRIAL COURT VIOLATED APPELLANT'S RIGHT OF CONFRONTATION AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION BY ALLOWING THE VIDEO RECORDED STATEMENT OF APPELLANT'S DAUGHTER TO BE PLAYED IN ITS ENTIRETY FOR THE JURY.

Assignment of Error No. 2:

THE TRIAL COURT VIOLATED APPELLANT'S RIGHT OF CONFRONTATION AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY ALLOWING THE TESTIMONY OF HIS ACCUSER TO BE GIVEN *IN CAMERA* RATHER THAN IN OPEN COURT.

## III. Admission of the Video-Recorded Interview

**{¶20}** In his first assignment of error, Knauff argues that the court abused its discretion by admitting the video-recorded interview. Knauff argues that the interview was hearsay and was not admissible under Evid.R. 803(4) – statements made for purposes of medical diagnosis or treatment.

**{¶21}** First, Knauff contends that D.K. was unaware that she was providing information for medical treatment, therefore her statements were unreliable. Second, Knauff argues that even if portions of the video-recorded interview were admissible under Evid.R. 803(4), the court abused its discretion by playing the "entire" video for the

Adams App. No. 10CA900

jurors. Knauff contends that many aspects of the interview went beyond that required for providing information for Dr. Shapiro's physical examination. Knauff additionally contends that the playing of the video-recorded interview violated his Confrontation Clause rights because he could not cross-examine D.K. on the statements in the interview in a "meaningful" manner.

A. Standard of Review

**{¶22}** The admission of evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, at paragraph two of the syllabus. An abuse of discretion consists of more than an error of judgment; it connotes an attitude of the trial court that is unreasonable, unconscionable, or arbitrary. *State v. Lessin*, 67 Ohio St.3d 487, 494, 1993-Ohio-52, 620 Ohio N.E.2d 72. When applying the abuse of discretion standard, we are not free to merely substitute our judgment for that of the trial court. *In re Jane Doe I* (1991), 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181, citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301.

**{¶23}** Initially, it is significant that Knauff did not object to the admission of the video-recorded interview. In fact, defense counsel specifically stated on the record that he had no objection to the state showing the jurors the video. (Tr. 318.) And defense counsel did not object when the state offered a redacted version of the video into evidence at the close of its case in chief.

**{¶24}** Evid. R. 103(A) provides:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

*(1) Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the *specific ground of objection*, if the specific ground was not apparent from the context[.]

(Emphasis added.)

**{¶25}** Evid. R. 103(A) follows the longstanding rule that the failure to make a specific objection to the admission of evidence waives the objection and it cannot thereafter form the basis of a claim in an appellate court. *Kent v. State* (1884), 42 Ohio St. 426, 430-431. Crim.R. 52(B), however, provides a mechanism by which defendants may obtain review of "plain errors" that affected "substantial rights" even where they failed to object. Thus, Knauff must demonstrate "plain error" in the admission of the video-recorded interview or he has waived its admission.

**{¶26}** "Plain error" exists only when it is clear the verdict would have been otherwise but for the error. *State v. Sanders,* 92 Ohio St.3d 245, 263, 2001-Ohio-189, 750 N.E.2d 90. Plain error review places three limitations on a reviewing court's decision to correct an error not objected to during trial. First, there must be legal error. Second, the error must be "plain." Within the meaning of Crim.R. 52(B), an error is "plain" if there is an "obvious" defect in the trial proceedings. Third, the error has to affect "substantial rights." *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. The Supreme Court of Ohio has "interpreted this [latter] aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." Id. The Court further explained, "[e]ven if a forfeited error satisfies these three prongs, however, Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court 'may' notice plain forfeited errors; a court is not obliged to correct them. We have acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error 'with the utmost caution, under exceptional

circumstances and only to prevent a manifest miscarriage of justice.'" Id*.,* quoting *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.

B. Statements for Purposes of Medical Diagnosis or Treatment

{¶27} Statements made outside of the courtroom, offered at trial to prove the truth of what they assert, are generally inadmissible as "hearsay" unless an exception applies. Evid.R. 801(C); Evid.R. 802; *State v. DeMarco* (1987), 31 Ohio St.3d 191, 195, 509 N.E.2d 1256. Out-of-court statements made for purposes of medical diagnosis or treatment are hearsay, but are admissible in court under the hearsay exception provided in Evid.R. 803(4). Such statements are only admissible "insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4).

{¶28} Knauff contends that the video-recorded interview does not satisfy the reliability threshold of Evid. R. 803(4). In deciding whether hearsay is reliable enough for admission under Evid.R. 803(4), courts look at several factors. The first is the "selfish-motive" doctrine, i.e., "the belief that the declarant is motivated to speak truthfully to a physician because of the patient's self-interest in obtaining an accurate diagnosis and effective treatment." *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, at ¶34, citing *State v. Eastham* (1988), 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (Brown, J., concurring). Another factor courts consider is the medical professional's subjective reliance on the statement, because "physicians, by virtue of their training and experience, are quite competent to determine whether particular information given to them in the course of a professional evaluation is 'reasonably pertinent to diagnosis or treatment[,]' and are not prone to rely upon inaccurate or false data in making a diagnosis or in prescribing a course of treatment." Id. at ¶41, quoting *King v. People*

Adams App. No. 10CA900

(Colo. 1990), 785 P.2d 596, 602. In *Muttart*, the Supreme Court of Ohio observed that the professional reliance factor is of "great import" in cases of child abuse. Id.

{¶29} The *Muttart* Court also provided a non-exhaustive list of additional factors that a court should weigh when considering whether out-of-court statements obtained from a young child are admissible under this exception:

(1) Whether medical professionals questioned the child in a leading or suggestive manner and whether the medical professional followed proper protocol in eliciting a disclosure of abuse;

(2) Whether the child had a reason to fabricate, e.g., a pending legal proceeding or bitter custody battle;

(3) Whether the child understood the need to tell the medical professional the truth; and

(4) Whether the age of the child could indicate the presence or absence of an ability to fabricate a story.

Id. at ¶49.

{¶30} Initially, Knauff contends that D.K.'s statements were inadmissible under Evid.R. 803(4) because she did not understand that she was providing them for purposes of medical treatment. In other words, Knauff argues that the justification for admitting statements made for purposes of medical treatment, i.e., the patient's incentive to tell the truth to the medical professional for proper treatment, was lacking. However, at the very beginning of the interview, D.K. acknowledged her awareness of the purpose of the interview. Soon after the interview began, D.K. revealed to Friehofer that she had sexual contact with her father. She then said, "that's why I'm here – to see

a doctor." Her statement satisfies this foundational requirement even though she was five-years-old.

{¶31} Next, Knauff admits that some answers provided by D.K. in the course of the interview aided Dr. Shapiro in determining the method of his subsequent physical examination, but he contends that many other questions and answers went beyond what was necessary to provide Shapiro information about physical symptoms. In other words, he disputes whether the professional reliance component of reliability is present. For example, Knauff asserts that Friehofer and D.K.'s discussion covered such topics as the weather, what school D.K. attended, that Knauff was "mean" to Alisha, the physical location where some acts of abuse occurred, and where D.K. spit Knauff's "pee." Knauff argues that the court erred by admitting these portions of the interview, rather than limiting the admitted portion of the interview to answers provided for Shapiro's use in determining the nature of his physical examination.

{¶32} However, Friehofer testified about additional purposes of the interview. Specifically, Friehofer stated that the interview provided recommendations not only for a course of physical treatment but also for recommendations on "therapy" and "psychological assistance." Friehofer used the hour-long interview with the then five-year-old victim to gain an understanding of the type and extent of abuse D.K. experienced. True, many of her answers went beyond what was necessary to conduct a basic physical examination. But all of D.K.'s statements, even those tangential or unrelated to the physical effects of the abuse, reasonably assisted Friehofer and subsequent medical professionals with the information necessary to prescribe a proper

Adams App. No. 10CA900

course of physical and *mental* treatment for the child.  In fact, the record reflects that D.K. underwent at least two months of counseling sessions prior to the trial.

{¶33}  Nonetheless, Knauff directs our attention to *State v. Clary* (1991), 73 Ohio App.3d 42, 596 N.E.2d 554, in which the appeals court held that a "blanket admission" of a statement made for medical treatment was an abuse of discretion.  *Clary* involved statements recorded by an emergency room doctor concerning "patient history" on an triage form while  the victim was at the emergency room for a "rape examination." Id. at 49-50. The "patient history" portion of the form was a brief recitation of the victim's story about the rape.  Id.  At trial, the court permitted the doctor, who ultimately performed the physical rape examination, to testify that the patient told him that two men raped her orally and vaginally, that the assailants punched her in the face at least twice, and that they threatened her with a knife during the assault. Id. at 50.  The appeals court concluded that the patient's statements concerning the knife threat and the number of assailants were not reasonably pertinent to the doctor's physical rape examination.  Id. at 53.

{¶34}  We conclude that *Clary* is distinguishable.  First, the victim in *Clary* was an adult.  The questions a medical professional must reasonably ask a five-year-old child to determine a course of treatment for sex abuse are far different from the narrative statement an adult rape victim might provide to a emergency room doctor.  Second, the victim's purpose in providing information in *Clary* was for a physical rape examination. There is no suggestion in *Clary* that the victim also sought or received mental health treatment.  Here, the varied subject matter of the interview and the number and type of questions posed by Friehofer were reasonable given that she was questioning a five-

year-old about a serious sex abuse allegation.  D.K.'s responses provided Dr. Shapiro with information necessary for his physical examination.  And her statements also provided him or other medical staff with information necessary to prescribe a course of mental health treatment.  Therefore we reject Knauff's contention that the questions and answers far exceeded a permissible scope.

{¶35}  A review of the four additional reliability factors found in *Muttart* bolsters our conclusion that the trial court did not abuse its discretion by admitting the video-recorded interview.  Concerning the protocol of the interview, Friehofer testified that she used established protocols for interviewing a child concerning sex abuse allegations.  She employed a technique known as "forensic interviewing."  Friehofer explained that a forensic interview is "non-biased" and "non-leading."  She testified that she performed at least 800 of these interviews in the four years she worked at Mayerson Clinic.  Friehofer stated that she always conducted the interview with an open mind, and specifically did not speak at length with the complaining parent before commencing the interview.

{¶36}  Our review of the video-recorded interview corroborates Friehofer's claims.  D.K. herself offered many of the details regarding the abuse without unnecessary suggestion.  D.K. would occasionally talk about matters unrelated to the abuse, as would be expected from a five-year-old.  In response, Friehofer would steer the conversation back to the abuse allegations and attempt to obtain more information about the specific circumstances.  But Friehofer almost always did so in a non-leading manner, i.e., asking D.K. to tell her more about what occurred, rather than suggesting what occurred.

**{¶37}** Likewise, there is no evidence in the record that D.K. had any reason to fabricate a story of abuse, such as an ongoing bitter custody battle. The record reflects that Knauff and Alisha Knauff divorced before the rape allegations surfaced. There is no credible evidence in the record supporting the existence of a custody dispute. And in fact, the molestation occurred while Knauff was exercising his visitation rights. Although Knauff claimed that his relationship with Alisha was "very poor," and Jerrylyn Mounts alluded to receiving some sort of threat from Alisha, these assertions do not reasonably support the existence of an ongoing bitter custody battle or other motive to fabricate.

**{¶38}** There is no evidence in the video-recorded statement or other parts of the record that suggest D.K. did not understand the need to tell Friehofer the truth. Her statement that she was at the clinic to see a doctor implies an understanding of the need to be truthful. And D.K.'s young age at the time of the interview – five-years-old – could reasonably indicate to the court that she would be incapable of fabricating a story concerning sexual abuse by her father. Indeed, after watching the video ourselves, we would find it incredible that a child of D.K.'s age could fabricate the details she related about sexual acts involving her father.

**{¶39}** We perceive no error in the court's decision to admit the redacted version of the video-recorded interview under Evid.R. 803(4). D.K.'s mental health was an important purpose of the forensic interview and all questions and answers provided were "reasonably pertinent" to medical treatment.

C. Confrontation Clause

**{¶40}** Knauff also contends that the court's admission of the video-recorded statement violated his Confrontation Clause rights because the statements in it

Adams App. No. 10CA900

amounted to "detailed and extensive accusations" against him and he could not confront these accusations in any "meaningful" manner. The state contends that D.K. was present and available for cross-examination, and thus Knauff cannot claim a violation of Confrontation Clause rights.

**{¶41}** "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' * * * [T]his bedrock procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)." *Crawford v. Washington* (2004), 541 U.S. 36, 42, 124 S.Ct. 1354. "Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment[.]" *State v. Self* (1990), 56 Ohio St.3d 73, 79, 564 N.E.2d 446. Thus, we will limit our review of Knauff's argument to the federal right of confrontation.

**{¶42}** Out-of-court statements that are "testimonial" in nature violate the Confrontation Clause of the Sixth Amendment when introduced at trial if the defendant has no opportunity to cross-examine the declarant on those statements. *Crawford* at 68. In *Crawford,* the Court provided a basic definition of testimonial statements known as the "objective-witness test." This test provides that statements are testimonial in nature when they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" Id. at 52.

**{¶43}** We need not determine, however, whether the statements in our case were "testimonial." The Court in *Crawford* was explicit: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the

Adams App. No. 10CA900

use of his prior testimonial statements." Id. at fn.9, citing *California v. Green* (1970)*,* 399 U.S. 149, 162, 90 S.Ct. 1930. D.K. testified at trial and was subject to cross-examination. Nonetheless, Knauff contends that he had no meaningful way of confronting the statements made in the video. But the record reflects that defense counsel had the opportunity to question D.K. concerning these statements, but chose not to. After defense counsel stopped cross-examining D.K., he went back into the courtroom and spoke with Knauff to determine whether there was any additional line of questioning Knauff wished pursued. Defense counsel then stated on the record that after consulting Knauff, he had no further questions. Consequently, even if some or all of the video-recorded interview was testimonial in nature, Knauff had the opportunity to cross-examine D.K. on her statements. Therefore we find no constitutional error in the court's decision to admit the video-recorded interview.

### D. No Plain Error

{¶44} Finally, even if we assumed without deciding that the admission of the video-recorded interview was error, it was not "plain error." As stated previously, "plain error" exists only when it is clear the verdict would have been otherwise but for the error. *Sanders,* supra. We have reviewed the entire trial record and are confident that the outcome would have been the same without the admission of the video-recorded interview.

{¶45} D.K. testified under oath that Knauff put his fingers in her "pee pee" and her "butt." She also stated that she spit his "pee" into a hole in the floor. The forensic evidence corroborated this testimony. Heitkemper testified that he removed a section of insulation underneath the hole in the floor and forwarded it to BCI for forensic analysis.

Adams App. No. 10CA900

BCI employees testified that the insulation contained both a component of saliva and sperm with the sperm matching Knauff's DNA profile.

{¶46} The jurors most likely still would have rejected the defense testimony that Knauff was never once alone in D.K.'s presence over the entire course of his weeks long period of custody. And they most likely still would have found Knauff unbelieveable when he tried to explain the presence of semen in the floor by claiming he decided to masturbate into a hole in his bedroom floor after watching his girlfriend shower. Thus, even if the court had excluded the video-recorded interview in its entirety, we are convinced that the outcome would not have changed. Consequently, this assignment of error is meritless.

IV. Constitutionality of Closed-Circuit Television Testimony

{¶47} In his second assignment of error, Knauff attacks the constitutionality of R.C. 2945.481, a statute that permitted D.K. to testify in the judge's chambers by closed-circuit television. Knauff argues that the Supreme Court of the United States, in *Coy v. Iowa* (1988), 487 U.S. 1012, 108 S. Ct. 2798, held "at a minimum" that a court violates a defendant's federal Confrontation Clause rights when it denies a literal face-to-face confrontation with an accusing witness.

A. Standard of Review

{¶48} We review constitutional challenges as a matter of law, ie., de novo. See, e.g., *Ohio Univ. Bd. of Trustees v. Smith* (1999), 132 Ohio App.3d 211, 223, 724 N.E. 2d 1155. Statutes enjoy a strong presumption of constitutionality. *State v. Bloomer*, 122 Ohio St.3d 200, 2009-Ohio-2462, 909 N.E.2d 1254, at ¶41. A party challenging the

Adams App. No. 10CA900

constitutionality of a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt. Id.

B. The Confrontation Clause and the Protection of Child Witnesses

**{¶49}** In *Coy* the Supreme Court reversed a child molestation conviction where an Iowa statute permitted a child witness to testify behind a screen. The Court noted that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Id. at 1016. In reversing the conviction, the Court emphasized that the Iowa statute required no factual finding of necessity before the court could employ the screen. In other words, the statute presumed that a court could, in all cases, deny the defendant a physical confrontation with an alleged child victim. Id. at 1021.

**{¶50}** Although the Court noted that Iowa had a "compelling" interest in protecting child abuse victims, it observed that the trial court made no "case-specific" finding that the procedures used were necessary to further that interest. Id. at 1025 (O'Connor, J., concurring.). The Court "le[ft] for another day . . . the question whether any exceptions exist" to the "irreducible literal meaning of the Clause: 'a right to *meet face to face* all those who appear and give evidence *at trial.*'" Id. at 1021, quoting *California*, supra, at 1943-1944 (Harsha, J., concurring). (Emphasis sic.)

**{¶51}** The Court answered this question two years later in *Maryland v. Craig* (1990), 497 U.S. 836, 110 S.Ct. 3157. There, the Court upheld a Maryland closed-circuit television statute and held that the Confrontation Clause did not require a literal face-to-face confrontation in all instances. Id. at 849-850. The Court observed that the core purpose of the Confrontation Clause was to ensure rigorous adversarial testing of

Adams App. No. 10CA900

accusing witnesses, i.e., cross-examination, providing sworn testimony under penalty of perjury, and jurors' observance of the witnesses' demeanor. Id. at 845-846. And the Court noted that although a face-to-face confrontation formed the core value behind the Confrontation Clause, it was a "preference" rather than a requirement. Id. at 847, 850. In upholding the Maryland statute, the Court held that a denial of a face-to-face confrontation could occur where it is necessary to: 1) further an important public policy; and 2) the procedures provided in lieu of the face-to-face confrontation ensure the reliability of the testimony. Id. at 850.

{¶52} The Maryland statute in question allowed a child abuse victim to testify via closed-circuit television if the trial court found that the child would suffer "serious emotional distress" such that the child could not "reasonably communicate." Id. at fn. 1. The Court held that Maryland had an "important" public policy interest in the protection of minor victims of sex crimes from further trauma. Id. at 855. The Court further held that whether a denial of a face-to-face confrontation was necessary would have to be determined on a case-by-case basis. Id. at 857-858. The Court explicitly decided against specifically defining the "minimum showing of emotional trauma" necessary because the "serious emotional distress" standard, "clearly suffices to meet constitutional standards." Id. at 856. Additionally, the Court observed that where a face-to-face confrontation caused significant emotional distress in a child witness, "there is evidence that such confrontation would in fact *disserve* the Confrontation Clause's truth-seeking goal." Id. at 857.

{¶53} In *Self*, supra, the Supreme Court of Ohio applied *Craig* and found R.C. 2907.41(A) and (B) to be substantially the same as the Maryland statute. The Court

Adams App. No. 10CA900

reviewed the procedure under R.C. 2907.41(B)(1)(b) for admitting a child sex abuse victim's videotaped deposition at trial in lieu of live testimony based upon a finding of "serious emotional trauma" and held it constitutional. Id. at syllabus.[1]

{¶54}  Nonetheless, Knauff urges us to conclude that *Craig* and *Self* are inapplicable here.  In his reply brief Knauff contends that in both cases, the respective Supreme Courts ruled narrowly and limited their holdings that the statutes are constitutional to an application of the "serious emotional distress" (*Craig*) or "serious emotional trauma" (*Self*) elements.  Knauff admits that R.C. 2945.481(E)(3) contains a provision for a finding by the trial court of "serious emotional trauma" before invoking the closed-circuit television procedure.  However, Knauff points out that the trial court here based its finding of necessity on the (E)(2) subsection, which requires a finding of "extreme fear" in the child witness.  Knauff does not explain why this distinction is legally significant, but contends that we should apply the general rule of *Coy* and limit the application of *Craig* and *Self* to findings of necessity based on serious emotional trauma or distress. Although our research revealed no Ohio case addressing this specific issue, we conclude that *Coy* does not require reversal here.  We also conclude that there is no significant legal distinction between a finding of necessity based on "serious emotional trauma" or "extreme fear" in terms of the necessity rule applied in *Craig* and *Self*.

C.  The Statute in *Coy* Required No Case-Specific Findings

{¶55}  The basis of the Court's decision in *Coy* was the statutory presumption in all cases of minor sexual abuse that a court could deny a defendant a face-to-face confrontation with an accusing child witness without any showing of necessity. *Craig* at

---

[1] Although the General Assembly recodified R.C. 2907.41 as R.C. 2945.481 in 1997, for the issues in this appeal, it is substantially identical to its prior version.

Adams App. No. 10CA900

844-845. Unlike the statue in *Coy,* R.C. 2945.481 requires case-specific findings of necessity before a judge can utilize the closed-circuit television procedure. Thus, R.C. 2945.481 does not presume that there is no right to face-to-face confrontation and *Coy* is not controlling. See *Self* at 81.

### D. R.C. 2945.481(E)(2) satisfies both *Craig* and *Self*.

{¶56} In approving an alternative to face-to-face confrontation the *Craig* Court focused on two major requirements: 1) the procedure must advance an important public policy; 2) the procedures used must maintain the reliability inherent in our system of rigorous adversarial testing. *Craig* at 856-857. Both requirements are satisfied here.

### 1. R.C. 2945.481(E)(2) Advances Important Public Policy Goals

{¶57} In both *Craig* and *Self*, the important public policy advanced was the protection of minor sex abuse victims from suffering further trauma by testifying in close physical proximity with the individual who allegedly molested them. Here, the court found that D.K. demonstrated "extreme fear", which caused her to be unable to communicate her testimony.

{¶58} A minor child who is experiencing "extreme fear" is under some form of severe emotional trauma or distress. "Extreme fear" is, undoubtedly, one of many associated characteristics of severe emotional distress or trauma. And we see no reason to differentiate between a finding of necessity based on "serious emotional trauma" or, as in this case, "extreme fear." Thus, we hold that a finding of "extreme fear" meets the "minimum showing of emotional trauma" and advances the important public policy of preventing further trauma to the child sex abuse witness.

Adams App. No. 10CA900

**{¶59}** Moreover, as the Court alluded to in *Craig*, a finding of necessity based on "extreme fear" and procedures designed to ameliorate that fear would advance another important public policy, i.e., that of ensuring the reliability of testimonial evidence. A child witness who is suffering "extreme fear" when testifying may have difficulty accurately and honestly conveying his or her testimony.

**{¶60}** To ensure that an alternative to face-to-face confrontation is constitutionally justified under *Craig* a trial court must:

1) Hear evidence and determine whether use of the closed-circuit television procedure is necessary to protect the welfare of the testifying child witness.

2) Find that the defendant's presence – not the courtroom generally -- causes the child's trauma.

3) Find that the emotional distress that would be suffered by the child witness is more than "*de minimis,* i.e., more than 'mere nervousness or excitement or some reluctance to testify[.]'"

Id. at 855-856, quoting *Wildermuth v. State* (1987), 310 Md. 496, 524, 530 A.2d 275.

**{¶61}** The trial court heard evidence to determine whether the procedure was necessary to protect D.K. On the witness stand D.K. was unresponsive and expressed fear at testifying. She told the court that her fear was attributable to both Knauff's presence and the courtroom generally. (Tr. 217.) And the trial court found that D.K.'s "extreme fear" was more than de minimis. The court attempted to ascertain her level of fear on a scale of one to ten, to which she responded that she was "real, real, real scared." (Tr. 215.)

Adams App. No. 10CA900

### 2. The Procedures Ensured the Reliability of the Adversarial System

{¶62} D.K. testified via closed-circuit camera in the physical presence of the judge, the prosecutor, and defense counsel. Both the defendant and the jurors could watch and listen to her responses and observe her demeanor while testifying. Defense counsel cross-examined D.K. and remained in constant communication with Knauff by means of a cell phone. The record further reflects that before defense counsel concluded his cross-examination, he went back into the courtroom and conferred in person with Knauff. Defense counsel then stated on the record that Knauff informed him he wished no further inquiry of D.K.

{¶63} In sum, we are confident that the procedures outlined in R.C. 2945.481(E)(2) and followed by the trial court retained the reliability of our system of rigorous adversarial testing. Consequently, we conclude that this assignment of error is meritless.

### V. Conclusion

{¶64} The admission of the video-recorded interview was not error. The contents of the interview were reliable and reasonably pertinent to medical diagnosis or treatment under Evid.R. 803(4). And there was no denial of confrontation because even if we assume portions of the interview were "testimonial" in nature, D.K. was available at trial and was subject to cross-examination. Additionally, we hold that R.C. 2945.481(E)(2) and the closed-circuit television procedure based upon a finding of "extreme fear" survive constitutional attacks premised on the Confrontation Clauses of the federal and state Constitutions.

JUDGMENT AFFIRMED.

Adams App. No. 10CA900

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

Kline, J. & McFarland, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
    William H. Harsha, Presiding Judge




### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**