[Cite as *State v. Hazel*, 2012-Ohio-835.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                                            :

    Plaintiff-Appellee                              :  C.A. CASE NO.     2011 CA 16

v.                                                              :  T.C. NO.     10CR808, 10CR827
                                                     10CR828,
                                                     11CR49

MICHAEL HAZEL                                          :

                                            (Criminal appeal from
    Defendant-Appellant             :        Common Pleas Court)

                                          :

                       . . . . . . . . . .

**O P I N I O N**

Rendered on the    2nd    day of     March   , 2012.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia   Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
        Attorney for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. No. 0012093, 4428 N. Dixie Drive, Dayton, Ohio 45414
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1}   Michael Hazel was found guilty by a jury of two counts of domestic violence; he was sentenced to two consecutive five-year terms of imprisonment and to five years of postrelease control.   He appeals from his conviction.

{¶ 2} On November 29, 2010, Hazel was indicted for domestic violence, abduction, felonious assault, and kidnapping for incidents that occurred on November 5, 2010 (Case No. 10CR808). The alleged victim was his girlfriend, Monica Sheets, and the count of domestic violence included a specification that the victim had been pregnant. On the State's motion, the trial court subsequently consolidated this case with two other cases in which Hazel was also charged with domestic violence against Sheets (Case Nos. 10CR827 and 10CR828), each with a specification that Sheets had been pregnant at the time of the offenses. All of the counts of domestic violence also specified that Hazel had previously been convicted of domestic violence and of aggravated burglary involving a family or household member.

{¶ 3} After these cases were consolidated, the State reindicted Hazel on three counts of felonious assault related to the events of November 5, 2010. Whereas the November 29, 2010 indictment (Case No. 10CR808) contained one count of felonious assault "by means of a deadly weapon, to wit <u>a knife and a hammer</u>," the January 31, 2011, indictment (Case No. 11CR49) contained three counts: two counts of felonious assault by means of a deadly weapon, one specifying a knife and the other a hammer, and a third count of felonious assault based on serious physical harm. (Emphasis sic.) Case No. 11CR49 was also consolidated with Case No. 10CR808.

{¶ 4} In February 2011, the State filed a pre-trial motion to call Sheets as a court's witness because, in her grand jury testimony and other communications with the prosecutor's office, she had changed her story and stated that she did not want to pursue charges. The trial court granted the State's motion.

{¶ 5} A three-day trial was held in March 2011. Before the case was submitted to the jury, the State conceded that it had failed to present sufficient evidence on the counts of abduction, felonious assault, and kidnapping in Case Nos. 10CR0808 and 11CR49; these counts were dismissed pursuant to Crim.R. 29. The remaining three counts of domestic violence were submitted to the jury.

{¶ 6} At trial, the State presented evidence regarding instances of domestic violence between Hazel and Sheets on three dates between September and November 2010.

{¶ 7} In the early morning hours of September 14, 2010, sheriff's deputies responded to a 911 call from 119 Dartmouth in Clark County. They found Sheets crying and upset. She reported that her boyfriend had slammed her head into a wall several times and had tried to bite her face. The deputies did not observe any injuries. This incident resulted in the count of domestic violence charged in Case No. 10CR827.

{¶ 8} On the evening of November 4, 2010, deputies were dispatched to an establishment called The Barn due to a domestic altercation at 119 Dartmouth. The victim (Sheets) reported to the dispatcher that her boyfriend punched her several times in the face. Sheets was no longer at The Barn when deputies arrived, but they found her at 119 Dartmouth. Although Sheets was calm when the deputies talked with her, her left cheek and eye were swollen and bruised, such that the left and right sides of her face looked noticeably different. These events gave rise to the count of domestic violence charged in Case No. 10CR828.

{¶ 9} In the early morning hours of November 5, 2010, another 911 call

was made from 119 Dartmouth; this was an "open line" call, meaning that the caller did not speak with the dispatcher, but the dispatcher could hear what was happening at the house. The deputies who responded found the house dark except for light coming from a back room and, through an open window, they could hear a female "yelling and screaming." As they assessed the situation, the deputies heard a sound "like one person striking another person," followed by more screaming and crying. Through the window, deputies could also see "struggling," with the victim on the ground and the perpetrator "standing and tussling with her around the shoulder, the head and hair." When the deputies entered the house to intervene, they saw that the door to the lighted back room – a bathroom – had been ripped off its hinges. They also reported "discoloration around [the victim's] ear and hairline" and some "fluid" in her hair that "appears * * * to be blood;" her eyes were swollen and she had been crying. This incident resulted in the charges of felonious assault, abduction, kidnapping, and domestic violence in Case Nos. 10CR808 and 11CR49.

{¶ 10} Sheets testified at trial that she did not recall most of the events on the dates in question, including why she had called 911, and that she had instigated fights with Hazel on those dates by hitting him, pulling a knife on him, and accusing him of infidelity. She also claimed that she threatened to kill herself and her unborn child on November 5, 2010, which caused Hazel to attempt to break into the bathroom to which she had retreated. She denied having been injured in the alleged altercations and claimed not to recall telling a paramedic that Hazel had hit her. She claimed that her pregnancy had made her very "hormonal" and had been "an emotional roller coaster." She also testified that she gave birth to her son at full-term on November 18, 2010.

{¶ 11} The jury found Hazel guilty of two counts of domestic violence, with additional findings that he had two prior convictions[1] and that the victim had been pregnant at the time of the offenses. These offenses were felonies of the third degree and related to the events of November 4 and 5, 2010. Hazel was found not guilty on the third count. He was immediately sentenced to two consecutive five-year terms and to a mandatory five-year term of post-release control.

{¶ 12} Hazel raises three assignments of error on appeal.

{¶ 13} Hazel's first assignment of error states:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND ABUSED ITS DISCRETION BY DENYING DEFENSE MOTION TO DISMISS ALL COUNTS OF DOMESTIC VIOLENCE.

{¶ 14} Hazel argues that the counts of domestic violence should have been dismissed, because the State "failed to present a prima facie case that the * * * parties were cohabitating" or otherwise satisfied the definition of "family or household member" for purposes of the domestic violence statute, R.C. 2919.25. Hazel's Crim.R. 29 motion to dismiss the charges of domestic violence was overruled at trial.

{¶ 15} R.C. 2919.25 provides, in pertinent part:

(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.

* * *

---

[1] One of the prior convictions was for domestic violence, and the other was for aggravated burglary of a family or household member; each of these prior convictions elevated the degree of the domestic violence offenses of which Hazel was convicted in this case. R.C. 2919.25(D)(3) and (4).

(F)(1)  "Family or household member" means any of the following:

a)  Any of the following who is residing or has resided with the offender:         (i)

A spouse, a person living as a spouse, or a former spouse of the offender;* *

*

(b)  The natural parent of any child of whom the offender is the other natural parent

or is the putative other natural parent.

(2) "Person living as a spouse" means a person who is living or has lived with the

offender in a common law marital relationship, who otherwise is cohabiting with the

offender, or who otherwise has cohabited with the offender within five years prior to

the date of the alleged commission of the act in question.

{¶ 16} "[T]he essential elements of 'cohabitation' are (1) sharing of familial

or financial responsibilities and (2) consortium.    R.C. 2919.25(E)(2) and related statutes.

Possible factors establishing shared familial or financial responsibilities might include

provisions for shelter, food, clothing, utilities, and/or commingled assets.  Factors that

might establish consortium include mutual respect, fidelity, affection, society, cooperation,

solace, comfort, aid of each other, friendship, and conjugal relations. These factors are

unique to each case and how much weight, if any, to give to each of these factors must be

decided on a case-by-case basis by the trier of fact ."  *State v. Williams*, 79 Ohio St.3d 459,

465, 683 N.E.2d 1126 (1997).

{¶ 17} The State contends that the evidence established two bases for concluding

that Hazel and Sheets were family or household members: they were persons living as

spouses and Sheets was pregnant with Hazel's child.

{¶ 18} Sheets's testimony at trial was somewhat inconsistent as to her living arrangements. On cross-examination by the State, Sheets stated that she had been in a romantic relationship with Hazel since January 2010 and that he had "never lived there" (with her), but had "stayed the night." She also stated, however, that one of their fights had occurred when he "didn't come home the night before," which caused Sheets to accuse Hazel of cheating on her. At another point in her testimony, Sheets stated that all or most of Hazel's clothing was at her house and that he stayed there "most nights." On cross-examination by the defense, Sheets testified that Hazel stayed with her "every now and then" but "didn't live there per se."

{¶ 19} In addition to Sheets's testimony, one of the sheriff's deputies who responded to Sheets's home on November 5, 2010, testified that he observed "male clothing" in an "adult bedroom" of the house. Another deputy testified that Sheets referred to Hazel as her "live-in boyfriend."

{¶ 20} Considering all of the evidence presented, the jury could have reasonably concluded that Hazel lived with Sheets and thus was a family or household member for purposes of the domestic violence statute.

{¶ 21} The State also argues that Hazel was Sheets' "family or household member" by virtue of the fact that she was pregnant with his child. We need not address whether a woman's pregnancy makes a couple the "natural parent[s] of any child" prior to the child's birth for purposes of this statute, because there was sufficient evidence from which the jury could have concluded that Hazel and Sheets were family or household members by virtue of their living arrangements, as discussed above.

{¶ 22} The first assignment of error is overruled.

{¶ 23} Hazel's second assignment of error states:

THE TRIAL COURT'S EVIDENTIAL [SIC] RULINGS, CUMULATIVELY, EFFECTED AN ABUSE OF DISCRETION AND A DENIAL OF DUE PROCESS TO APPELLANT.

{¶ 24} Hazel argues that various instances of prosecutorial misconduct and decisions by the court that were an abuse of its discretion deprived him of a fair trial.

{¶ 25} First, Hazel contends that the prosecutor improperly used hypotheticals during voir dire to get the potential jurors to commit to a particular view of the events relevant to his case.

{¶ 26} The prosecutor presented two hypothetical situations to potential jurors during voir dire, over Hazel's objections; both involved situations in which the victim of a crime did not want to prosecute. The first hypothetical involved a burglary: a homeowner reported a burglary to the police but, after the police investigation identified the burglar as someone known to the homeowner, the homeowner did not want to press charges. The prosecutor asked the potential jurors whether a burglary had still occurred in this situation and whether the State should still be able to pursue the charges. The jurors answered affirmatively.

{¶ 27} The prosecutor then turned to the second hypothetical: a domestic violence victim reported a crime to the police, but later decided that she did not want to pursue charges. As with the first hypothetical, the prosecutor asked the jurors whether, in that situation, the crime of domestic violence had occurred and whether the State should be

able to pursue charges against the alleged perpetrator. The prosecutor also solicited from the jurors some reasons why a victim of domestic violence might continue to live with a perpetrator of domestic violence and opinions about whether she was at fault if she were beaten again. The prosecutor then stated some of the allegations in this particular case and acknowledged that she did not know what the victim would tell the jury at trial. The prosecutor concluded by asking whether, if the State had proven beyond a reasonable doubt that Hazel had committed domestic violence, the jurors would be able to return a guilty verdict, even if the victim was reluctant to cooperate. The jurors answered affirmatively.

{¶ 28} In response to these hypotheticals, defense counsel talked with the jurors about the reasons someone might not want to pursue charges after reporting an offense to the police. Defense counsel suggested some possibilities, including that the initial report to the police was untrue or that a victim or witness was a reluctant to testify under oath in court if the initial information provided to the police was not entirely true, for fear of getting in trouble. He also discussed at length the need for the jurors to determine the credibility of witnesses who have told more than one version of the same events.

{¶ 29} The Eighth District has discussed the purpose of voir dire, as follows:

The purpose of the examination of a prospective juror upon his voir dire is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant. In order to ensure that result, counsel is afforded reasonable latitude on the voir dire examination. The scope of the inquiry will not be confined strictly to the subjects which constitute grounds for the sustaining of a challenge for cause; but if it extends

beyond such subjects it must be conducted in good faith with the object of obtaining a fair and impartial jury and must not go so far beyond the parties and the issues directly involved that it is likely to create a bias, a prejudice, or an unfair attitude toward any litigant.

It is neither wise nor desirable for this court to prescribe the specific form such interrogatories are to take, or the manner of their presentation. That is a matter wholly for the trial court to determine in the exercise of its sound discretion and in the light of all the facts and surrounding circumstances.

(Citations omitted.) *State v. Walton*, 8th Dist. No. 90140, 2008-Ohio-3550, ¶ 85-87.

{¶ 30} The prosecutor posed hypotheticals containing circumstances similar to those in this case, where the State sought to press charges although the victim of a crime preferred not to do so. The hypotheticals posed to the jurors indicate that the State sought to ensure that the potential jurors did not think that the victim should have the final say over whether a case was filed and that the potential jurors would be able to convict – if the evidence supported a conviction – where the victim was uncooperative. The hypotheticals did not require potential jurors to commit during voir dire to the guilt of the perpetrator in the hypotheticals or to Hazel's guilt. The trial court did not abuse its discretion in allowing the prosecutor's use of hypotheticals for this purpose.

{¶ 31} Second, Hazel contends that the trial court abused its discretion in calling Sheets as a court's witness, thereby permitting the State to question her as if on cross-examination, without demonstrating that she would have been hostile to the State. He asserts that the treatment of Sheets as a court's witness was an improper use of Evid.R. 614,

because it allowed the State to impeach Sheets with her prior inconsistent statements without requiring it to show surprise or affirmative damage, as required under Evid.R. 607.

**{¶ 32}** Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The rule "authorizes the court to call a witness whom a party might otherwise call, on the party's 'suggestion' that the witness would then recant another, prior statement favorable to that party." (Internal quotations and citation omitted.) *State v. Arnold,* 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218 (2d Dist.), at ¶ 43, citing *State v. Kiser*, 6th Dist. Sandusky No. S-03-028, 2005-Ohio-2491. "When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *Arnold* at ¶ 44, citing *State v. Apanaovich*, 33 Ohio St.3d 19, 514 N.E.2d 394 (1987).

**{¶ 33}** The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify. *State v. Curry*, 8th Dist. No. 89075, 2007-Ohio-5721, ¶ 18. "A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *Id.*, citing *State v. Brewer*, 10th Dist. No. 84AP-854, 1986 WL 2652, *3 (Feb. 25, 1986). The prime candidate is a victim and an eyewitness who will not otherwise cooperate with the party originally planning to call him. *Id.*

**{¶ 34}** "As a practical matter courts will approach the exercise of the right to call witnesses with some degree of circumspection since merely presenting a person as the

court's witness may clothe that witness with an enhanced measure of dignity and prestige" in the eyes of a jury and may be an "unwarranted invasion of the adversarial system." *State v. Combs*, 9th Dist. Summit No. 15025, 1991 WL 259530, *2 (Dec. 4, 1991), citing 1 Weissenberger, *Ohio Evidence*, Section 614.2, 85 (1980). However, "[t]he decision as to whether to call a witness on its own motion pursuant to Evid.R. 614(A) is within the discretion of the trial court and will be reversed only for an abuse of such discretion." *State v. Marshall*, 9th Dist. Lorain No. 01 CA007773, 2001 WL 1647706, *2 (Dec. 26, 2001), citing *State v. Forehope*, 71 Ohio App.3d 435, 441, 594 N.E.2d 83 (5th Dist. 1991).

{¶ 35} Before trial, the State filed a motion to call the alleged victim, Monica Sheets, as a court's witness. The motion stated:

> The State believes that Ms. Sheets is a necessary witness to this action as she is the victim of all the charges. Ms. Sheets, however, has indicated that she is not interested in pursuing criminal charges against the defendant. Furthermore, based on information gathered by deputies, grand jury testimony, and later correspondence, Ms. Sheets has changed her story of the events leading up to the charges. The State does not know what Ms. Sheets will testify to once on the stand. Therefore, the State believes that calling Ms. Sheets as court's witness is the best manner in which to elicit the truth related to the charges.

{¶ 36} The trial court granted the State's motion to call Sheets as a court's witness. In its ruling, the court concluded that Sheets had "provided several conflicting statements about the alleged crime [which] * * * justify making her a Court's witness." The

court also concluded that, under such circumstances, the State was not required to demonstrate surprise before cross-examining the witness.

{¶ 37} Although Hazel argues that the State should have been required to show surprise and affirmative damage before impeaching a witness who might have otherwise been a State's witness, it is well-settled that a party is not required to make such a showing before impeaching a court's witness. *Apanovitch,* 33 Ohio St.3d at 22, 514 N.E.2d 394, citing *State v. Dacons,* 5 Ohio App.3d 112, 449 N.E.2d 507 (10th Dist. 1982); *Arnold* at ¶ 44; *State v. Griffin*, 2d Dist. Montgomery No. 20681, 2005-Ohio-3698, ¶ 37. Indeed, a request for designation of a court's witness often arises precisely because the State has anticipated an unfavorable change in the witness's account of previous events. Under such circumstances, the State should not be required "to take its chances" by calling as a State's witness one whose testimony would be beneficial to the jury but who has a indicated an intent or motive to testify in a way that would be detrimental to the State's case. *State v. Adams,* 62 Ohio St.2d 151, 158, 404 N.E.2d 144 (1980).

{¶ 38} Based on the State's representations that Sheets's "grand jury testimony, and  later correspondence" indicated a change in her story between the dates of the alleged offenses and the time of trial, appropriate circumstances existed to support the trial court's designation of Sheets as a court's witness. The trial court did not abuse its discretion.

{¶ 39} Third, Hazel contends that the trial court adopted a "raw prosecutorial position" when it questioned firefighter Michael Myers, outside the presence of the jury, about whether statements made to him by the victim were made for the purpose of medical

diagnosis and treatment.

{¶ 40} At trial, before he was questioned about the purpose of the victim's statements to him, Myers testified on direct examination about the condition of the victim's house ("walls were broke with stuff and things thrown everywhere") and about the information he gathered from the victim. Myers described his usual procedure of documenting identifying information and injuries "for the purpose of treating and diagnosing the person," and explained that "run sheets" recording such information are kept in the ordinary course of business. Myers further testified that, when he saw Sheets, he did not "personally observe" any injuries on her. He also testified that she denied having any injuries and did not want to go to the hospital. Because of her pregnancy, Myers "told her it would be best for her to go [to the hospital] for the safety of the child to have the child checked out." According to Myers, Sheets stated that she had been "hit in the head and kicked in the stomach and the lower back; *** and she was trying to protect her stomach" during the attack. Later, in the ambulance, Myers observed a laceration on Sheets's forehead.

{¶ 41} Defense counsel repeatedly objected during Myers's testimony, on the bases that the State's questions were leading, that there was "no foundation laid," and that the testimony was hearsay. The objections were overruled. The defense then cross-examined Myers.

{¶ 42} At the end of Myers's testimony, defense counsel renewed his objection to the hearsay nature of Myers's testimony. The jury was then excused, and the judge stated that he "wanted to ask [Myers] some questions outside the presence of the jury

[to determine] * * * whether or not statements that Monica Sheets made to [Myers] were made for the purpose of medical diagnosis and treatment." The judge asked Myers how he became aware of the injuries to the victim, to which Myers responded that he had asked Sheets about her injuries. The court asked the following question several times, in slightly different forms: "Did you have any concerns about her well-being when you asked [about her injuries]? Her physical well-being." Myers responded that he did have concerns about her physical well-being, and particularly about her unborn child. He also explained that people sometimes have injuries that are not apparent by looking at them. The defense was then permitted to question Myers about the victim's condition and whether any medical treatment was provided by Myers. (It was not.) After the defense cross-examined Myers regarding Sheets's statements to him, the following exchange occurred:

COURT: *** You knew why you were going out there, right? You knew what the nature of the call was?

WITNESS: Yes, I did.

COURT: You knew that it was a domestic violence call?

WITNESS: Yes.

COURT: And you were worried about the well-being of this unborn child. Were you concerned that something may have happened to Monica Sheets that could in turn cause problems for the unborn child?

WITNESS: Yes. I mean she told me that she was hit and kicked in the back and head area, and I was concerned maybe some of the blows had struck the child or she possibly had broken ribs or something.

COURT: Is it fair to say that sort of with her injuries, would the injuries of Monica Sheets, would those injuries be sort of intertwined with your concern for the well-being of the unborn child?

WITNESS: Yes, they would. If she is injured, there is a good possibility that the child was injured as well.

COURT: But what you are saying, and correct me if I'm wrong, Monica Sheets did have some injuries but they didn't appear to be injuries that - - They didn't appear to be serious injuries to you; is that fair to say?

WITNESS: Yes. I personally, just me, meaning, I think she had more injuries than she was leading on to. I think she hurt but didn't want to make, you know, I think her ribs were hurting but she never, you know, she kept saying she was fine.

{¶ 43} On appeal, Hazel claims that the court's questioning of Myers was improper. He asserts that the court "repeatedly lead [sic] [Myers] to give answers allowing [the court] to conclude that [Myers's] testimony should qualify as an exception to the hearsay rule," i.e., that his conversation with Sheets related to medical diagnosis and treatment.

{¶ 44} The trial court did handle Hazel's objections to Myers's testimony in an unorthodox manner, particularly in allowing the jury to hear the testimony that was alleged to be hearsay *before* questioning the witness to determine whether the statements properly fell within an exception to the hearsay rule. It is also unclear why the court questioned Myers itself about the purpose for which the victim's statements were made,

rather than allowing the State to do so. These issues, however, are not dispositive of Hazel's argument.

{¶ 45} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible. Evid.R. 802. But there are numerous exceptions to the hearsay rule, including the following: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). Such statements are deemed to be trustworthy and admissible because "the effectiveness of the treatment depends upon the accuracy of information given to the physician [so] the declarant is motivated to tell the truth." *State v. Brewer*, 6th Dist. Erie No. E-01-053, 2003-Ohio-3423, ¶ 28, citing *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988).

{¶ 46} In this case, however, Sheets repeatedly asserted that she was not injured and did not want treatment. As such, the rationale that her statements were truthful because her treatment depended upon the accuracy of the statements did not apply. In other words, because Sheets repeatedly stated that she did not want to be treated and had not suffered any injury, we cannot conclude that her statements were made for the purpose of medical diagnosis and treatment. It is the declarant's belief regarding whether her statement will be used for medical diagnosis or treatment and will affect her well-being that is crucial to the reliability of the statement. *State v. Schauer*, 4th Dist. Pickaway No. 99CA17, 2000

WL 370304, *3, (May 15, 2000), citing *State v. Clary*, 73 Ohio App.3d 42, 53, 596 N.E.2d 554 (10th Dist. 1991). "[R]egardless of the doctor's belief regarding the purpose of a declarant's statement, '[w]hat really counts is what the patient thinks is relevant.'" (Citations omitted.) *Schauer* at *3. Whether a medical professional believes the purpose of the statement is relevant to medical treatment or diagnosis is irrelevant. Id.

**{¶ 47}** Because the record reflects that Sheets did not make her statements to Myers for the purpose of medical diagnosis or treatment, the trial court abused its discretion in permitting Myers to testify about Sheet's statements.

**{¶ 48}** An error in the admission of evidence is not grounds for granting a new trial or for setting aside a verdict unless such action affected the outcome of the case. "An error is harmless where there is no reasonable probability that the error contributed to the outcome of defendant's trial." *State v. Holt*, 10th Dist. No. 97APA10-1361, 1998 WL 514055, *3 (Aug. 20, 1998), citing *State v. Brown,* 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992). Because there was other evidence consistent with Myers's testimony about what transpired between Hazel and Sheets on November 5, 2010 – including the responding deputies' observations of the attack as it unfolded – we conclude that the improper admission of Myers's testimony about what Sheets told him did not affect the outcome of the case and was harmless error.

**{¶ 49}** The Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus *may* warrant the reversal of his conviction. (Emphasis added.) *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). The doctrine of cumulative error does not apply in this case because Hazel has not

identified multiple instances of harmless error. *Id.* Although Hazel's trial was not without error, he is not entitled to a reversal of his conviction on the basis of cumulative prejudicial error.

{¶ 50} The second assignment of error is overruled.

{¶ 51} Hazel's third assignment of error states:

APPELLANT WAS DENIED DUE PROCESS BY PROSECUTORIAL MISCONDUCT IN PRESENTING EVIDENCE OF ALLEGED CHARGES THAT SHE KNEW WOULD NOT SUPPORT A CONVICTION.

{¶ 52} Hazel contends that the State filed some of the charges against him – felonious assault, abduction, and kidnapping – knowing that it could not convict him of those offenses, with the purpose to "incite" the jury against him and make the jury believe that he "had already 'caught a break' by the dismissal" of those charges when it deliberated on the charges of domestic violence. The State responds that it could not have known before trial whether these charges could not be proven, because it did not know what the content of Sheets's testimony would be.

{¶ 53} The standard of review for grand jury indictments is far less stringent than the beyond a reasonable doubt burden on criminal trial prosecutions; the potential for inordinate delay or for abuse by overzealous counsel militates against stricter review of these proceedings. *State v. Marich*, 6th Dist. Erie No. E-85-53, 1986 WL 14816 (Dec. 19, 1986), citing *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Furthermore, because of the secrecy with which grand jury proceedings are shrouded, it is impossible for this court to stringently review the sufficiency of the indictment. *Id.*

**{¶ 54}** There was some evidence offered at trial in support of the charges for felonious assault, abduction, and kidnapping related to the events of November 5, 2010. For example, the count of felonious assault alleged that Hazel had attempted to cause physical harm to Sheets by means of a deadly weapon (a knife or hammer). Deputies did testify that a knife was found in Hazel's waistband when they arrested him, that they observed two hammers in the room where the couple had been having an altercation, and that the deputies later came to believe that "those hammers had some evidentiary value."

**{¶ 55}** With respect to abduction and kidnapping, Sheets testified that, on November 5, 2010, she called 911 from the bathroom, that she was blocking the door, and that Hazel was trying to break into the bathroom. At various times, she gave differing accounts of why he was trying to break into the bathroom. The deputies who responded to the house found the bathroom door broken off its hinges. They also observed Hazel "fighting" and "tussling" with Sheets in the doorway to the bathroom, while he was standing and she was on the floor. Based on this evidence and Sheets's initial account of the events, the State could have reasonably believed that Sheets had been cornered by Hazel in the bathroom by force or threat of force for some period of time and had been unable to escape. Such conduct would have supported the counts of abduction and kidnapping, especially if Sheets had testified, consistent with her statements to deputies at the time of the incident, that Hazel refused to let her leave the house and threatened her.

**{¶ 56}** After the court dismissed the counts of felonious assault, abduction, and kidnapping, the prosecutor explained to the jury in closing argument that the evidence had "not established" those charges and that they would not be addressed further. The trial

court did not explain the dismissal of those charges to the jury, nor did it instruct the jury that these counts in the indictment could not be considered for any purpose. Hazel did not ask the court to provide any explanation or limiting instruction to the jury.

{¶ 57} Hazel's suggestion that the jury viewed the dismissal of some counts as a windfall for him and held it against him in its deliberations of the domestic violence charges is speculative and unsupported by the record. We cannot conclude that Hazel was prejudiced by the dismissal of some counts in the indictment.

{¶ 58} The third assignment of error is overruled.

{¶ 59} Although this issue was not raised on appeal, we have noted during our review of this case that the term of post-release control imposed by the trial court was not authorized by law. R.C. 2967.28(B) provides that, "for a felony of the third degree that is not a felony sex offense and in the commission of which the offender caused or threatened to cause physical harm to a person," the offender "shall be subject to a period of post-release control * * * after the offender's release from imprisonment [of] three years." R.C. 2967.28(B)(3). In Hazel's case, the trial court imposed a five-year period of post-release control for each offense.

{¶ 60} A sentence that is contrary to law is void and amounts to plain error. *State v. Schneider*, 8th Dist. Cuyahoga No. 93128, 2010-Ohio-2089, ¶ 14, citing *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d 568, ¶ 14. Where a sentencing entry incorrectly imposes post-release control, that portion of the judgment which improperly imposes post-release control is void, but the entire sentence is not void. *State v. Fischer,* 128 Ohio St.3d 92, 942 N.E.2d 332, 2010-Ohio-6238, ¶ 26; *State v. Evans*, 8th Dist. No.

95692, 2011-Ohio-2153, ¶ 8-9; *State v. Lawrence*, 2d Dist. Montgomery No. 24513, 2011-Ohio-5813, ¶ 7. Thus, in Hazel's case, it was plain error for the trial court to impose a five-year term of post-release control, and that sentence is void. Hazel's sentence will be modified to reflect a three-year term of post-release control.

{¶ 61} Finally, we note that Hazel sent a letter to this court while this appeal was pending; Hazel apparently sought to bring to our attention a "Notice of Legal Instruction" that he previously had sent to his attorney and had attempted to file with the Clark County Clerk of Courts. In the Notice of Legal Instruction, which was attached to the letter, Hazel asked his attorney to explore alleged deficiencies in the indictments and verdict forms in his cases, because they did not include "any specific statutory subsection." Hazel's other attachments included letters he sent to the Clerk requesting file-stamped copies of his filings and a letter sent to him by his appellate attorney. We note that Hazel's appellate brief was filed in September 2011, and that his letter to the attorney and his attorney's response were sent in December 2011.

{¶ 62} The letter from Hazel's attorney informed Hazel that the attorney had considered Hazel's contention that his indictments were defective for failure to include statutory subsections ("parenthesis or subparends"). It further stated:

> I do not believe that this is a reversible error since the indictment does
> contain the language of the specification plus the possible penalties therefore.
>
> If I am wrong and if your current appeal is unsuccessful, you may move the
> Court of Appeals to advance this argument.

{¶ 63} In Ohio, a criminal defendant has the right to representation by

counsel or to proceed pro se, but "these two rights are independent of each other and may not be asserted simultaneously." *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 32; *State v. Thompson*, 33 Ohio St.3d 1, 6-7, 514 N.E.2d 407 (1987). Because Hazel is represented by counsel, we will not consider the arguments raised in his Notice of Legal Instruction. Moreover, it is apparent that the attorney considered these arguments and found them to lack merit. As the attorney's letter to Hazel suggests, Hazel may address any perceived deficiency in his appellate representation by means of an application to reopen his appeal pursuant to App.R. 26(B), after the journalization of the appellate judgment. However, our reference to App.R. 26(B) should not be construed in any way as a comment on the merit of Hazel's arguments.

{¶ 64} As modified, the judgment of the trial court will be affirmed.

. . . . . . . . . .

GRADY, P.J. and HALL, J., concur.

Copies mailed to:

Lisa M. Fannin
J. Allen Wilmes
Hon. Douglas M. Rastatter